## SCHWERIN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8572.

United States Court of Appeals.

District of Columbia.

Argued Dec. 6, 1943.

Decided Jan. 10, 1944.

Mr. Henry G. Burke, of Baltimore, Md., for petitioner.

Mr. John F. Costelloe, of Washington, D. C., pro hac vice, by special leave of Court, with whom Messrs. Samuel O. Clark, Jr., Assistant Attorney General, Sewall Key, and Miss Helen R. Carloss, Special Assistants to the Attorney General, were on the brief, for respondent. Messrs. J. P. Wenchel, Chief Counsel, and C. A. Ray, Special Attorney, Bureau of Internal Revenue, both of Washington, D. C., also entered appearances for respondent.

Before MILLER, EDGERTON, and DOBIE,[1] Associate Justices.

DOBIE, Circuit Judge.

The Tax Court of the United States determined a deficiency in the income tax of Martin Schwerin (hereinafter called the taxpayer) for the years 1936 and 1937 in the respective amounts of $6,166.25 and $6,250.46. The taxpayer has duly appealed to this court. The only question presented for our consideration is whether the taxpayer's distributive share of the net income for the partnership firm of Outwater, Schwerin and Barnett, for the taxable years 1936 and 1937 was 50%, as is contended by the taxpayer, or 75%, as found by the Tax Court.

The following findings of fact were made by the court below:

"The taxpayer is an individual residing in Tucson, Arizona, and is engaged in fluorspar mining near Elizabethtown, Illinois, which mining business is conducted as a partnership under the name of Outwater, Schwerin and Barnett. His income tax returns for the years 1936 and 1937 were filed with the Collector of Internal Revenue for the Eighth District of Illinois.

"In 1920 the taxpayer acquired approximately 268-3/4 acres of land near Elizabethtown, Illinois, at $50 an acre. In addition he expended other sums to establish

---

[1] Sitting by assignment of the Chief Justice of the United States, pursuant to the provisions of the Act of December 29, 1942, 56 Stat. 1094, 28 U.S.C.A. § 17(b), entitled "An Act to amend the Judicial Code to authorize the Chief Justice of the United States to assign circuit judges to temporary duty in circuits other than their own."

his title, thereby bringing the total cost of the land to about $23,000. He believed that a fluorspar mine could be operated on the land, and in 1923 began negotiations with Addison Outwater, of New York City, for financing the development of the property. These negotiations culminated in an agreement dated May 2, 1927, whereby Outwater was to supply $30,000 in cash for the purpose mentioned. Of this amount $5,000 was to be paid presently and the balance at the rate of $1,200 per month, with the provision that the installments might be increased if the reasonable needs of development of the property should require it. The agreement provided that when the entire $30,000 had been advanced by Outwater, or sooner if the parties agreed, the taxpayer should cause a corporation to be organized under the laws of the state of Illinois, to which the property should be conveyed, the mining operations thereafter to be carried on by the corporation. The authorized capital stock of the corporation was to consist of three classes: $50,000 par value of Seven Percent Cumulative First Preferred Stock, $330,000 par value of Second Preferred Stock, entitled to no dividends, and 1,000 shares of no par value common stock. The First Preferred Stock was to be issued only for additional capital. Of the $330,000 par value of Second Preferred Stock, $50,000 was to be held in the treasury, and of the remaining $280,000 par value of such stock the taxpayer was to receive $250,000 and Outwater $30,000. The 1,000 shares of no par value common stock were to be divided equally between them. It was contemplated that out of the first proceeds from the operation of the property the $30,000 par value of Second Preferred Stock issued to Outwater and the $10,000 par value of such stock issued to the taxpayer should be redeemed contemporaneously. After the redemption of that stock, the proceeds from operations were to be allocated 50 percent to the redemption of the remaining $240,000 par value of Second Preferred Stock held by the taxpayer and 50 percent as dividends upon the common stock held equally by the taxpayer and Outwater.

"The moneys to be advanced by Outwater were to be handled through Central Union Trust Company of New York, which later became Central Hanover Bank & Trust Company, and by a concurrent agreement dated May 2, 1927, between the taxpayer, Outwater and the bank, it was agreed that the mining property which had been conveyed to the bank as trustee should, upon the joint demand of the taxpayer and Outwater, be reconveyed to the corporation to be formed or to other nominees of the said parties:

"The taxpayer proceeded in the development of the property according to the agreement. It became necessary to have development funds in excess of the $30,000 advanced by Outwater, and such funds were provided 50 percent by the taxpayer and 50 percent by Outwater. No corporation was formed, however, and on May 17, 1929, a new agreement was entered into between the taxpayer and Outwater revising to some extent the original plans for a corporation. Under this second agreement the common stock was to remain the same and was to be issued 501 shares to the taxpayer and 499 shares to Outwater. All preferred stock was eliminated. It was contemplated that the proceeds from operations should be distributed under the heading of 'royalties' which were to be computed on the tonnage of fluorspar mined. The first $33,000 was to be distributed in equal amounts to the taxpayer and Outwater and was to cover the additional development funds provided by them in the interval. The next $40,000 was to be distributed 75 percent to Outwater and 25 percent to the taxpayer. Upon payment of the two amounts mentioned, the next $480,000 to become distributable as 'royalties' was to be distributed 75 percent to the taxpayer and 25 percent to Outwater. After this amount had been paid, all subsequent payments were to be on the basis of one half to the taxpayer and the other half to Outwater. This agreement disclosed for the first time that C. M. Barnett, Jr., was the owner of one half of the interest previously indicated as belonging to Outwater.

"The corporation contemplated by the agreement of May 27, 1929, was not organized and the mining operations were continued by the taxpayer as before, the proceeds therefrom being distributed, however, according to the ratios prescribed by the 1929 agreement.

"Under date of May 1, 1933, the taxpayer, Outwater and Barnett executed a partnership agreement for the operation of the above-described properties. They were operating under this agreement during the years 1936 and 1937, the years here in question. In that agreement it was provided

that 'Out of profits and income of the co-partnership 75 percent should be the share of the taxpayer, 12-1/2 percent the share of Outwater and 12-1/2 percent the share of Barnett until aggregate payments of $460,000 had been made, after which the profits and income were to be divided 50 percent to the taxpayer and 25 percent each to Outwater and Barnett. The ninth paragraph of the partnership agreement provided as follows:

" 'Ninth: It is understood and agreed that the copartnership hereby defined is not a new partnership but is a continuation of the partnership existing between the partners hereto since the year 1927, and is a definition of the rights and interests of the parties as created and covered by oral agreements dated May 2nd, 1927, and May 17th, 1929, and that the provisions of the said agreements dated May 2, 1927, and May 17, 1927, have been in part performed and in part modified and abrogated by such agreements, and it is understood and agreed that the present agreement supersedes the prior agreements between the parties, and particularly that the written agreements last mentioned are hereby cancelled and abrogated.'

"Title to the mining properties was conveyed to the partnership of Outwater, Schwerin and Barnett by the Central Hanover Bank & Trust Company on August 18, 1937. For the years 1933, 1934, 1935, 1936 and 1937 the taxpayer executed for the partnership and filed partnership returns of income showing the distributable shares of the partnership income to be 75 percent to the taxpayer and 12-1/2 percent each to Outwater and Barnett.

"The actual distributions made by the partnership to the three partners for the years 1936 and 1937 were in excess of their distributable shares of income as shown on the partnership returns, the excess distributions being made from depletion and depreciation reserves. All distributions, however, were made on the basis of 75 percent to the taxpayer and 12-1/2 percent each to Outwater and Barnett.

"For the above years up to and including 1936 the taxpayer reported on his individual returns as his income 75 percent of the net income of the partnership as his distributable share thereof. In his income tax return for 1937 he reported only 50 percent of the net income of the partnership as his distributable share of the partnership income.

"For the year 1936 the taxpayer filed a claim for refund, the basis for the said claim being that he had reported 75 percent of the net income of the partnership as his distributable share thereof, whereas his distributable share amounted to only 50 percent. On some date not shown, the taxpayer was advised by the Commissioner that there was an overassessment of his income tax for the year 1936 in the amount of $3,821.02. The amount of the overassessment was credited in part to the tax years 1935 and 1937 and refunded in part. The Commissioner thereafter concluded that the taxpayer's distributable share of the partnership income was 75 percent and determined the deficiencies here in question on that basis."

The relevant statutes and Treasury Regulations are as follows:

Revenue Act of 1936, c. 690, 49 Stat. 1648:

"§ 181. Partnership not taxable

"Individuals carrying on business in partnership shall be liable for income tax only in their individual capacity.

"§ 182. Tax of Partners

"There shall be included in computing the net income of each partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year.

"§ 183. Computation of Partnership Income

"The net income of the partnership shall be computed in the same manner and on the same basis as in the case of an individual." 26 U.S.C.A. Int.Rev.Acts, page 897.

Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"Art. 182-1. *Distributive share of partner.*—Individuals carrying on business in partnership are taxable upon their distributive shares of the net income of such partnership, whether distributed or not, and are required to include such distributive shares in their returns. * * *

* * * * *

"If the result of partnership operation is a net loss (excess of allowable deductions over gross income), the loss will be divisible by the partners in the same proportion as net income would have been divisible (or, if the partnership agreement provides for the division of a loss in a manner different from the division of a gain, in the manner so provided), and may

be taken by the individual partners in their returns of income."

The taxpayer now contends that he is subject to an income tax on only 50% of the net income of the partnership; the remaining 25% received by him, he insists, was a return of capital constructively paid to him by his two partners. We think that this assertion is irreconcilable with the prior conduct of the taxpayer, and that it is also contrary to both the undisputed facts and the applicable law in this case.

■ It is elementary that partnership profits may be distributed in whatever proportions as may be agreed by the partners and that the partnership agreement is determinative of the respective liabilities of the partners for federal income taxes. Hellman v. United States, 44 F.2d 83, 70 Ct.Cl. 498. The controversy in the instant case, therefore, springs from a construction of the agreement of May 1, 1933, which established the partnership of Outwater, Schwerin and Barnett, and which defined the rights and obligations of the individual partners during the taxable years in question. The third clause of this agreement specifically sets forth the distributive share to which each partner is entitled in the following language:

"Third: It is understood and agreed that the respective shares which the above-named partnership (sic) shall have in the income and profits of the partnership are as follows:

"(a) Out of the profits and income of the copartnership 75% shall belong to and be the share of the said Martin Schwerin, 12-1/2% shall belong to and be the share of the said Charles M. Barnett, Jr., and 12-1/2% shall belong to and be the share of the said Addison Outwater. This proportionate share and division of the profits and income of the copartnership shall continue until the aggregate payments made under this subdivision shall amount to the sum of Four Hundred and Sixty Thousand Dollars ($460,000.00). * * *

"(b) After said sum of Four Hundred and Sixty Thousand Dollars ($460,-000.00) has been divided and distributed among the partners as income and profits of the copartnership * * * thereafter the share of each of the aforesaid partners shall be to wit: Martin Schwerin 50%, Addison Outwater 25%, Charles M. Barnett, Jr. 25%.

"(c) It is the intent of this agreement that profits and income shall be divided and distributed among the partners as same may become available, retaining in the treasury not more than Fifty Thousand Dollars ($50,000.00) except by unanimous agreement of the partners."

Since the total distributions of the partnership had not aggregated $460,000 by the end of the taxable years under consideration, the clear and unambiguous language of the agreement itself indicates that the taxpayer was entitled to 75% of the net income of the partnership. That he should be taxable accordingly is further evidenced by the fact that the actual partnership practice was in express conformity with the terms of the third clause of the agreement. Thus, all distributions made by the partnership were divided in a ratio of 75% to the taxpayer and 12-1/2% to each of the other two partners.

The parties were perfectly free to agree that this larger share of 75% was to be paid to the taxpayer only for a limited period (until the total distributions aggregated $460,000) and not indefinitely. Consequently, during this period in which the taxpayer was receiving the larger sum he was obviously receiving a distributive share of partnership profits. CF. Billwiller's Estate v. Commissioner, 2 Cir., 31 F.2d 286, certiorari denied 279 U.S. 866, 49 S.Ct. 481, 73 L.Ed. 1003; Commissioner v. Banfield, 9 Cir., 122 F.2d 1017. We therefore need not concern ourselves with special "mortgage liens on the property" or special "royalty payments" or any other arrangement that the parties might have made had they intended to accomplish the results now desired by the taxpayer, i.e., that 25% of the 75% the taxpayer received represented profits constructively received by Outwater and Barnett and constructively paid to the taxpayer by them as their share of the purchase price which was to be paid by the partnership for the mining properties originally acquired by the taxpayer.

■ Accordingly, we are here bound by what the parties actually did and not by what they might have done; we are controlled by the contract they signed, not by any contract into which they might have entered. See Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520; Clemmons v. Commissioner, 5 Cir., 54 F.2d 209; Bruce v. Helvering, 64 App.

D.C. 192, 76 F.2d 442. The articles of partnership contained no mention whatever of payment to the taxpayer for capital assets; nor can these articles be so construed under any reasonable interpretation.

The following additional circumstances are rather conclusively inconsistent with the contention of the taxpayer:

(1) All of the partnership returns for the years 1933 through 1937 state that the taxpayer's percentage of net income from the partnership was 75%, and each of these partnership returns was sworn to and signed by the taxpayer.

(2) At no time did the taxpayer report that he had received a capital gain from the partnership, a gain which he would have realized and should have reported if we accept his present theory that 25% of the 75% he received constituted a return on his original capital invested in the mining property.

(3) An examination of the 1935 partnership income tax return indicates a net loss of $7,463.41 for that year. Since this figure does not take into consideration a salary of $6,000 paid to the taxpayer, the total loss of the partnership for 1935 was, in reality, $13,463.41. In the computation of the distributive share of the losses of the respective partners, the loss shown for the taxpayer is listed as 75% of $13,463.41. Likewise, the loss shown for each of the taxpayer's partners (Outwater and Barnett) is 12-1/2% of $13,463.41.

It is thus beyond dispute that this allocation of loss is consistent only with the theory that the taxpayer's distributive interest in the partnership was 75%. If we concede, arguendo, the correctness of the taxpayer's present allegation that he had only a 50% income interest and a 25% return of capital gain interest, why would he, in point of fact, and how could he, in legal theory, take a full 75% of the partnership loss in his personal income tax return? As a "50%" partner he would have been entitled to take only 50% of the net partnership loss. Taxpayer's own ante litem motam interpretation therefore corroborates our view that his distributive share of the net income of the enterprise was 75% and not 50%. We might also note that the partners of the taxpayer do not agree with the taxpayer's interpretation of the articles of partnership.

Accordingly, we affirm the determination of the Commissioner and the decision of the Tax Court that the taxpayer, for the years 1936 and 1937, is taxable on the basis of a distributive share of 75% of the net income of the firm of Outwater, Schwerin and Barnett.

Affirmed.