BECK CHEMICAL EQUIPMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53289. Filed February 26, 1957.

*Harry L. Brown, Esq.*, for the petitioner.
*Maurice S. Bush, Esq.*, for the respondent.

OPINION.

FISHER, *Judge:*

## I.

Respondent determined that petitioner was a member of a joint venture, taxable as a partnership for Federal income tax purposes during the years 1944 and 1945, and, therefore, that its distributive share of the net profits thereof were taxable to petitioner in said years under sections 182 and 183 of the Internal Revenue Code of 1939. Petitioner contends that Beck and Beattie Manufacturing Company did not enter into a joint venture, and that regardless of whether such business relationship existed, petitioner had no taxable income for either year in issue since it did not receive actual distribution of its allocate share of the net profits of the flame thrower enterprise until some time between 1950 and 1952, after protracted litigation.

The primary question to be decided in these proceedings is whether a joint venture existed between petitioner and Beattie during the years 1944 and 1945 within the meaning of the Federal statutes. We think the question must be answered in the affirmative for the reasons stated below.

The legal relationship known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association of persons to

carry out a single business enterprise for profit." 48 C. J. S., Joint Adventures, secs. 1 and 2. *Estate of L. O. Koen*, 14 T. C. 1406 (1950); *Chase S. Osborn*, 22 B. T. A. 935, 945 (1931) and cases cited therein. The terms of such relationship may be informal and need not be reduced to writing. *Morris Cohen*, 15 T. C. 261, 272 (1950).

Under section 3797,[1] Internal Revenue Code of 1939, a joint venture is one of the various unincorporated associations included within the broad definition of a partnership "through or by means of which any business, financial operation, or venture is carried on * * *." The Code thus makes its own classification and prescribes its own standards for qualification as a "partnership," and to the extent thereof, it supersedes local law for Federal income tax purposes. Regs. 111, sec. 29.3797-1; *Commissioner* v. *Tower*, 327 U. S. 280 (1946).

In *Commissioner* v. *Culbertson*, 337 U. S. 733 (1949), where the bona fide existence of a family partnership was in issue, the Supreme Court announced the general test for determining the validity of partnerships for income tax purposes as follows:

The question is * * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of dis-interested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *

These principles and commentary, we believe are equally applicable here where the kind of partnership is an alleged joint venture within the purview of section 3797. *Lucia Chase Ewing*, 20 T. C. 216, 230 (1953), affirmed on another issue 213 F. 2d 438 (C. A. 2, 1954); *Chase S. Osborn, supra; Hutchinson* v. *Birdsong*, 207 N. Y. S. 273, 275 (1925).

Upon the facts fully detailed in our Findings of Fact herein, and guided by the test enunciated in the *Culbertson* case, we are convinced that the parties from the very inception of their common business undertaking intended to and in fact did enter into a joint venture within the broad definition of that term in section 3797 of the Code.

In essence, the undisputed facts of record show that petitioner and Beattie entered into a common business arrangement in the early part of 1942 for the purpose of making a profit through the manufacture and sale of flame throwers to the United States Government. Under

---

[1] SEC. 3797. DEFINITIONS.

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

    *        *        *        *        *        *        *

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization.

their agreement said enterprise was to last for the duration of World War II and the net profits thereof were to be divided equally between petitioner and Beattie.

Respondent's determination that a joint venture existed between the parties is, of course, prima facie correct, and the burden of proof of error is on petitioner. Petitioner, in denying the existence of a joint venture relation with Beattie, suggests on brief that the oral agreement with Beattie possibly created a master-servant relationship, in which petitioner was to receive one-half of the net profits (derived from sales of the war device) as wages for its contribution of the unpatented invention to the enterprise. Petitioner has pointed to no facts in the record to sustain its view, and we have found none. In our opinion the unequivocal facts show that the parties to the verbal agreement did not contemplate a "compensation status," as suggested by petitioner, but to the contrary, Beck Chemical Equipment Corporation was to have a mutual proprietary interest in the venture's profits. The circumstances of the instant case differ widely from those in *Arthur N. Blum*, 11 T. C. 101 (1948), affd. 183 F. 2d 287 (C. A. 3, 1949), in which there was an express employment agreement.

The fact that petitioner was required to make available the engineering services of Lawrence J. Beck, the inventor of the flame thrower (and petitioner's principal stockholder), for work on the project at Beattie's plant does not in any manner militate against the manifest intention of the parties to operate as a joint venture. We do not question the fact that his skill and know-how were essential to the success of the business undertaking. The fact that petitioner was required to make such services available, however, appears to us to add color to the reality of the joint venture.

Petitioner likewise relies upon *Roland P. Place*, 17 T. C. 199 (1951), affd. 199 F. 2d 373 (C. A. 6, 1952), and *Carl G. Dreymann*, 11 T. C. 153 (1948), suggesting that the plan for mutual participation in the venture's profits may have merely represented the "payment for the use of property" or the "proceeds from the sale of property." Again, petitioner fails to call our attention to any facts in the record to sustain its position, and we do not find any. Moreover, we think these cases are clearly distinguishable on their facts from the case at bar and are not controlling here.

That petitioner here was entitled to enjoy the fruits of the common enterprise is strongly indicative of the reality of its participation as a principal; and in the absence of any cogent evidence that their agreement contemplated, or had been transformed into, an essentially master-servant relationship or some other legal status, we are of the view that the parties intended to be and, in fact, were co-proprietors in the profits to be derived from their venture.

In much the same vein, petitioner, relying on *Bowe-Burke Mining Co.* v. *Willcuts*, 45 F. 2d 394, (D. Minn., 1930), contends that although Beck admittedly participated in losses of the venture for the purpose of adjusting the net profit in which it was ultimately to share, such participation did not necessarily serve to constitute the two corporations as joint adventurers, and was consistent with a compensation status. Granting the theory, as far as it goes, it is obvious, by the same token, that sharing of losses is consistent with a partnership or joint venture arrangement, and is one of the factors to be considered in resolving the issue. It should be added, for completeness, that *Bowe-Burke Mining Co.* is distinguishable from the instant case on the facts. There, the taxpayer mining company, a corporation, entered into a contract with another corporation, Picklands, Mather & Co., whereby the latter agreed to finance the operation of a mine, upon which the taxpayer held a lease, and to market the ore produced therefrom, in consideration of 50 per cent of the net profits. Holding that no joint venture existed between the taxpayer and Picklands, Mather & Co., even though losses in the operation of the mine were borne equally by the two parties, the court emphasized that the "title to the mining lease remained in the mining company. The title to the ore when delivered to Picklands, Mather Co. passed to that company." The court concluded that each corporation thus "retained its identity with respect to its dealings with the other." Here, although the verbal agreement in question also obligated Beattie to advance the requisite financing for the venture, we think it is clear that petitioner and Beattie intended to become co-proprietors of the enterprise, and that while Beattie was considered the managing partner of the joint enterprise, title to the manufactured goods did not vest solely in Beattie. In all events, we think petitioner has failed to meet the burden of proving the contrary.

The fact that for practical business reasons, as reflected in our Findings of Fact, the over-all operations of the common enterprise were conducted solely in the name of Beattie or that petitioner's association with the venture was not known to its only customer, the United States Government, does not defeat the legal relationship. See *R. A. Bartley*, 4 B. T. A. 874, 879 (1926). See also *John T. Newell*, 17 B. T. A. 93, 95, 97 (1929). Nor is it determinative of the question before us that no separate books of account and records relating to their enterprise were maintained by the joint adventurers. See *E. L. Kier*, 15 B. T. A. 1114, 1118 (1929).

The further argument advanced by petitioner that the parties did not intend to create a joint venture relation since it did not share "mutual control and responsibility"—i. e., it did not actively participate in the management of the flame thrower enterprise—must like-

wise be rejected. It is true that active management of the enterprise and the manufacture and sale of the flame thrower were handled entirely by Beattie, which was in accordance with petitioner's arrangement with Beattie (although petitioner, through Beck, made engineering services available). But it is likewise recognized under the law that partners may be inactive. Under the statutes of the State of New York, where the contract in question was entered into, a joint adventure may exist without a contribution of services or active participation in its concerns. N. Y. Partnership Law sec. 96. Thus, the reservation, as here, to one partner of the function of managing the common enterprise and financing its affairs does not, of itself, vitiate the existence of an otherwise valid joint venture. *J. A. Riggs Tractor Co.*, 6 T. C. 889, 897 (1946); *Elihu Clement Wilson*, 11 B. T. A. 963, 971 (1928). Concededly, absence of any voice in the management and control of the business is an evidentiary circumstance to be considered. However, it is not necessarily a controlling consideration and was, in the instant case, a natural circumstance since Beattie, under the agreement, furnished the necessary finances, plant facilities, sales activities, and all management functions of the common undertaking. This was a natural arrangement, because Beattie was in a position to furnish such facilities, just as petitioner was in a position to furnish the process by means of which the flame thrower was made, and without which there would have been no business. Conceding that the facilities furnished by Beattie were necessary, the point is that both parties to the common enterprise furnished elements necessary to the business, which could not have been operated without the contributions of both parties. See *Clarence B. Ford*, 19 T. C. 200, 207 (1952).

In urging that mutual control of the activities of the common enterprise is essential to the existence of a valid joint venture, petitioner cites *Joe Balestrieri & Co.* v. *Commissioner*, 177 F. 2d 867, 871 (C. A. 9, 1949), affirming a Memorandum Opinion of this Court. We have carefully reviewed the appellate court's opinion and find that it is based upon the law of California relating to joint ventures in a factual setting quite different from that in the instant case. In *Balestrieri*, the taxpayer, a corporation, had entered into a contract with a partnership (consisting of two persons who owned all stock in taxpayer corporation, and a third person) to pay a prospective creditor any deficits which might occur on money borrowed to conduct ore milling operations of the partnership, in return for one-half of any profits which the partnership might earn. The taxpayer's liability was secondary to that of the partnership, and was in the nature of a guarantee.

We think it is obvious that a joint venture did not exist in *Balestrieri*, and that the case is in no sense here controlling. We think the appli-

cable principles are brought into better perspective by the following statement made in *Levin* v. *Commissioner*, 199 F. 2d 692 (C. A. 2, 1952), in which the Court of Appeals said (p. 694) :

> But the Culbertson case does not require active participation to make a person a partner for tax purposes. On the contrary, it made it clear that no one element is essential. The Supreme Court decided against the taxpayer because the only evidence of an intent to form a partnership was the expectation that the taxpayer's sons would, in the future, contribute their time and services to the partnership. That decision was reached not because an indispensable element was lacking, but because the one element present was not enough to justify a finding of intent to carry on a present partnership. The mere fact that Richard did not actively participate in the business does not preclude the possibility of a bona fide intent to form a partnership. * * *

See also *First Mechanics Bank* v. *Commissioner*, 91 F. 2d 275, 279 (C. A. 3, 1937).

Petitioner also cites *Lucia Chase Ewing, supra*, but we need not prolong our discussion of this phase of the case beyond saying that it is distinguishable from the instant case on the facts, and that a recitation of elements which may be considered is not equivalent to holding that any one of them is controlling or conclusive.

While not of itself determinative of the question of whether or not petitioner was a joint venturer in the common enterprise, we think it is of some significance, in considering petitioner's intent, that its present contention that it was not a party to a joint venture is clearly an afterthought. As reflected in our Findings of Fact, petitioner, on several occasions up to the filing of its amended petition herein, in official documents, including its 1944 and 1945 income tax returns, has maintained that it was a joint venturer with Beattie.

In considering the evidence bearing on the intention of the parties, we have not based our conclusions or ultimate findings upon any single factor, but have considered all of the facts and circumstances. *Commissioner* v. *Culbertson, supra*. Upon such consideration, we hold that petitioner and Beattie had formed, and did maintain, a joint venture during the years here material.

## II.

Having held that a valid joint venture existed between petitioner and Beattie during the years 1942 through 1946, we must now determine the *time* when petitioner's 50 per cent distributive share of the profits therefrom should be properly included in its gross income for tax purposes. Respondent contends that petitioner's allocate share of the net income earned by the joint venture in 1944 and 1945 is taxable to petitioner under the provisions of section 182 (c) of the Internal Revenue Code of 1939, notwithstanding the fact that petitioner did not receive actual distribution of said income until some

time between 1950 and 1952. Petitioner, on the other hand, argues that it should not be required to include its distributive share in its gross income prior to actual receipt since its share was the result of a "compromise settlement" made with Beattie in 1950 after protracted litigation, and that until the settlement it had no immediate or undisputed right to the earnings. We disagree with petitioner's position.

With respect to taxation of members of a partnership, section 182 of the Internal Revenue Code of 1939 provides, in pertinent part, as follows:

In computing the net income of each partner, he shall include, *whether or not distribution is made to him*—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership computed as provided in section 183 (b). [Emphasis supplied.]

The foregoing provision of the statute is free from ambiguity and makes it clear that the income of the joint venture (which we have indicated above is a form of partnership under the Code), is taxable in the year in which the income is earned, and not the year in which actual distribution thereof is made to the partners. Since the record shows that the income of the flame thrower enterprise was actually earned during the period between March 1, 1942, and December 31, 1945, we are convinced that under section 182 (c), one-half share of said income is taxable to petitioner in such years.

The statute, by the phrase, "whether or not distribution is made to him [the partner]" expressly renders immaterial the fact that petitioner did not receive its share of the venture's 1944 and 1945 earnings until some years later. The immateriality of the year of distribution on the question of when partnership income is taxable was recognized by us many years ago in *Robert A. Faesy*, 1 B. T. A. 350 (1925)[2] in circumstances similar to the case before us. There, following the rule announced in *Fred Truempy*, 1 B. T. A. 349 (1925), we held the taxpayer partner taxable upon his distributive share of the partnership profits in the year his proportionate share was earned, even though subsequent disagreement with his partner and litigation precluded him from ever receiving any of his money. The fact that each partner's distributive share in the net income of the common venture may not be currently distributed due to a dispute, *United States* v. *Baker*, 233 F. 2d 195 (1956), affirming 133 F. Supp. 666; or as the result of operation of State law, *Heiner* v. *Mellon*, 304 U. S. 271 (1938); or

---

[2] The case cited, as well as some of the other authorities mentioned herein, arose under section 218 (a), Internal Revenue Act of 1918, which was thereafter changed to section 182 in the Revenue Act of 1928. The language of the section before us is found in substantially the same form in all of the Revenue Acts.

until the contractual obligations of the joint venture are fully performed, renegotiated, and its debts paid in accordance with the terms of the agreement of the parties, does not relieve them from reporting as income their proportionate shares of the net profit in the year it is earned. See *First Mechanics Bank* v. *Commissioner*, 91 F. 2d 275 (C. A. 3, 1937). It is well established that the Federal income tax system is based on an annual accounting. Under that law the question whether taxable profits have been made is determined annually by the results of the operations of the year and not by any of the aforesaid circumstances which may postpone distribution of such profits. The policy and effect of the law cannot be circumvented by agreement of the joint venturers postponing the actual accounting with each other.

Here the crux of petitioner's argument is that the existence of a real controversy between it and Beattie during the years in question rendered the amount of its distributable share indefinite and impossible of ascertainment, and that such amounts were not specifically established until the settlement agreement in 1950. However, in accordance with the established principles already discussed, we find no merit in this contention. In *Stoumen* v. *Commissioner*, 208 F. 2d 903 (C. A. 3, 1953), affirming a Memorandum Opinion of this Court, where the taxpayer disclaimed knowledge of having earned any partnership income because of the alleged embezzlement of partnership property by the deceased partner, the court, in imposing tax liability on the surviving partner's distributive share in the year such income was actually earned, said (p. 908):

By virtue of that section [sec. 182 (c)] one half of the partnership's ordinary net income *automatically* became his income even though he actually received none of it knowingly and *was ignorant of its existence at the time*. [Emphasis supplied.]

It is thus evident that the principles of scienter and actual receipt have no application to the issue of whether or not partners are to be charged with their distributive shares of partnership profits under section 182 (c), and this is so even though a partner is on the cash basis.

In support of its position, petitioner relies upon *Adele Trounstine*, 18 T. C. 1233 (1952), reversed sub nom. *Estate of Norman S. Goldberger* v. *Commissioner*, 213 F. 2d 78 (C. A. 3, 1954), where we held that joint venture profits wrongfully withheld by the managing partner, but later received by taxpayer as a result of a court decree were taxable only in the year of actual receipt on the ground that until the decree issued the taxpayer had "no established or uncontroverted right to the funds." After careful consideration, we follow the rule established in *Goldberger*, *supra*, and *Stoumen*, *supra*. We have followed

a like approach in our recent Opinion in *Frederick S. Klein*, 25 T. C. 1045 (1956), involving a situation where partners entered a compromise settlement after threatened litigation. We said (p. 1051):

The distributive share of each partner mentioned in said statute [sec. 182 (c)] is to be determined in accordance with the provisions of the partnership agreement. *Schwerin* v. *Commissioner*, (C. A., D. C.) 139 F. 2d 843, affirming a Memorandum Opinion of this Court; *Hellman* v. *United States*, (Ct. Cl.) 44 F. 2d 83. Also, as provided by the statute, these distributive shares are taxable to the partners, whether or not actual distribution is made to them; and the fact that distribution may have been delayed because of a dispute between the partners is immaterial for income tax purposes. *Kurt H. deCousser*, 16 T. C. 65; *Bell* v. *Commissioner*, (C. A. 5) 219 F. 2d 442, affirming a Memorandum Opinion of this Court.

## III.

We turn next to the question of deficiencies. It is well settled that respondent's determination of deficiencies is presumptively correct, and except as to new matter pleaded by him, the burden of proof here is on the petitioner. Rule 32, Tax Court Rules of Practice. The record shows that respondent, in his statutory notice, determined that one-half of the earnings of the joint venture for 1944 and 1945 (as reflected on the books of Beattie) was taxable to petitioner as its distributive share of the venture's net income. At the trial herein counsel for petitioner stipulated orally that it would "in no way attack" the correctness of the amounts of alleged "income subject to Federal income tax," as reflected on the books and records of Beattie and has offered no evidence to the contrary. We, therefore, sustain respondent to the extent of his determination in his statutory notice of deficiencies in income taxes, declared value excess-profits taxes, and excess-profits taxes (and also as to additions to tax so determined and discussed *infra* under issue IV).

With respect to respondent's claim for increased deficiencies and increased additions to tax, however, the burden of proof is on respondent to sustain the affirmative allegations in his amended answer. In this connection, the evidence reveals that at the trial petitioner admitted receiving the sum of $250,000 as a "compromise settlement" during the years 1950–1952, and respondent, thereupon, alleged that petitioner actually received as its one-half distributive share of the venture's profits during the taxable years 1944 and 1945 the respective amounts of $108,405.12 and $123,263.90, in lieu of the lesser amounts set forth in his notice of deficiency.

Respondent computed these revised amounts of taxable income, upon which he based his claim for increased deficiencies, by prorating the full amount of the compromise settlement among all of the operative years of the venture—viz, 1942 through 1946. In making said apportionment, respondent calculated the aliquot portion for each

year by determining the relationship of the stipulated profits for each period to the profits of all of the operative years as stipulated, and then applied the resultant percentage ratios to the $250,000 settlement. Obviously, respondent's technique was based on the assumption that all of the settlement money represented petitioner's one-half distributive share of the venture's profits for its operative years and that such profits should be annualized in proportion to the annual profits determined in the statutory notice.

In our opinion there is not a sufficient basis in the record to support respondent's contention, and that, to the extent of his affirmative claim for increased deficiencies and additions to tax, he has failed to meet the burden of proof resting upon him.

There is no evidence in the record on the basis of which we can hold that some specified part of the excess of the $250,000 settlement figure over petitioner's share of the profits of the joint venture, as shown on the books, was earmarked as income attributable to 1944 or 1945, or both of them.

The settlement figure was precisely that—i. e., a settlement figure—and no part of the excess over the book figures was attributed to any one source or to any particular year or years. We cannot supply the missing evidence by speculative inference. The excess over the book figures, for example, may have contemplated, in part, the factor of interest. If so, the factor might have been substantial, and might have been more than half of such excess. Beattie may have made a bad bargain (or a good one). The excess may have represented an estimate of petitioner's share of earnings without determining the period or periods for which it was estimated.

The record supplies none of the information essential to an attribution of particular parts of such excess to either 1944 or 1945. Likewise, the lack of facts is not supplied by respondent's theoretical approach. On the other hand, petitioner included such excess in its return for the year in which it was actually received, and there is nothing before us to suggest that it was wrong in doing so.

Respondent's claim for increased deficiencies and increased additions to tax is, therefore, denied.

## IV.

The final issue is whether respondent properly imposed the 25 per cent addition to tax for petitioner's failure to file excess profits tax returns for the years 1944 and 1945. According to respondent's determination of deficiencies, sustained by us hereinabove, petitioner had excess profits net income of more than $10,000 in each of said taxable years, and therefore was obliged to file excess profits tax returns under

section 729.[3] Petitioner filed its regular corporation returns (Form 1120) for 1944 and 1945, in which it reported no income from its joint venture with Beattie but failed altogether to make and file excess profits tax returns (Form 1121) for such years.

Section 729, Internal Revenue Code of 1939, makes the provisions of sections 52 and 291 and the pertinent regulations thereunder with reference to the filing of income tax returns applicable to excess profits tax returns, except in cases where a taxpayer's excess profits net income is less than the specific exemption in the amount of $10,000 provided in section 710 (b). Thus, under sections 729, 710 (b), and 52, every corporation with excess profits net income of more than the $10,000 exemption in each of the taxable years 1944 and 1945 was required to file excess profits tax returns in said years.

The applicable statute for failure to file such returns is section 291 (a) which provides for the imposition of additions to tax ranging from 5 to 25 per cent "[i]n case of any failure to make and file returns * * * unless it is shown that such failure is due to reasonable cause and not due to wilful neglect."

Respondent does not claim that petitioner was willfully negligent in failing to file its excess profits tax returns, but contends that its failure in this regard was not due to reasonable cause. Under section 291 (a) of the Code, reasonable cause has been defined to mean the exercise by taxpayer of ordinary business care and prudence. Regs. 111, sec. 29.291–1; *Southeastern Finance Co.* v. *Commissioner*, 153 F. 2d 205 (C. A. 5, 1946). The issue presented is one of fact and the burden of establishing reasonable cause is on the petitioner. *Wm. J. Lemp Brewing Co.*, 18 T. C. 586, 597 (1952).

In explanation and as exculpatory circumstances of its failure to file the returns here in question, petitioner's president and principal witness, Sigmund Pines, offered several reasons for its failure to file the required returns. One of the reasons he gave was "oversight." Another was that petitioner's officers did not know and could not ascertain its distributive share of the venture's profits for the taxable years involved herein until 1951, and, therefore, did not know whether or not excess profits returns were required.

---

[3] The provisions of section 729 of the Code, applicable to the year 1945, are, in part, as follows:

(a) GENERAL RULE.—All provisions of law (including penalties) applicable in respect of the taxes imposed by Chapter 1, shall, in so far as not inconsistent with this subchapter, be applicable in respect of the tax imposed by this subchapter.

(b) RETURNS.—

* * * * * * *

(2) No RETURNS REQUIRED.—Notwithstanding subsection (a), no returns under section 52 (a) shall be required to be filed by any taxpayer under this subchapter for any taxable year for which its excess profits net income, computed with the adjustments provided in section 711 (a) (2) and placed on an annual basis as provided in section 711 (a) (3), is not greater than the specific exemption provided in section 710 (b) (1).

[The language of section 729 applicable to 1944 differs in some respects from the foregoing, but not in any way here material.]

With respect to the first excuse, we believe that failure to file a return because of oversight is tantamount to failure to file a return due to "forgetting." In *Rogers Hornsby*, 26 B. T. A. 591 (1932), we held that merely forgetting to file a return does not constitute reasonable cause. It is thus clear that petitioner's oversight, if such was the case, does not relieve it of additions to tax under section 291 (a).

Likewise, we do not believe the second reason given for petitioner's complete failure to file excess profits tax returns—i. e., "We did not know what we earned"—constituted reasonable cause under the circumstances before us. We note, in passing, that precisely the same situation existed with respect to the filing of Federal income tax returns (Form 1120), yet this lack of knowledge and the pending litigation did not prevent petitioner from filing said returns for the taxable years in question.

As aforementioned, petitioner was required by section 52 to file excess profits tax returns even though it did not know exactly what its income from the joint venture was, unless it came within the $10,000 specific exemption provided in section 710 (b). There is no evidence in the record that petitioner believed that its share of the joint venture's income for each of the years in question was less than $10,000 in excess profits net income. Contrariwise, there is every indication that petitioner believed the flame thrower enterprise was earning substantial profits and that its distributive share thereof would greatly exceed $10,000 in each of the taxable years. Thus, in its action for accounting against Beattie commenced in 1943 in the Supreme Court of New York, in a complaint filed under oath by its vice president, petitioner alleged upon "information and belief" that "large profits have been and are being derived" by the joint venture.

If petitioner's officers had any doubt that the enterprise did not have sufficient earnings or that the amount thereof was unascertainable, it could have been relieved of the necessity of filing an excess profits tax return upon presentation of all the facts alleged as a reasonable cause for such noncompliance in an affidavit to the collector as prescribed by Regulations 111, section 29.291–1. But in the absence of a proper showing, it was required to make a return. *T. H. Symington & Sons*, 35 B. T. A. 711, 740 (1937). See *Jockey Club*, 30 B. T. A. 670 (1934), affd. 76 F. 2d 597 (C. A. 2, 1935).

As shown by our findings, the joint venture had substantial sales (as well as substantial earnings) during the years 1944 and 1945. Moreover, its income tax returns for those years show that it then considered itself a party to a joint venture. We think that petitioner was or should have been cognizant of the fact that its distributive share of the venture's profits for 1944 and 1945 might greatly exceed its $10,000 specific exemption. Even if it was unaware of the fact that sales and income for 1944 and 1945 were substantial, its failure to file a return

cannot be excused on the ground of reasonable cause unless it had reliable and affirmative information that its share of the earnings for the years in question were in fact less than the amount of the exemption. In *O'Sullivan Rubber Co.* v. *Commissioner*, 120 F. 2d 845, 848, (C. A. 2, 1941), affirming 42 B. T. A. 721, which involved the imposition of additions to tax under section 291 (a) for failure to file a personal holding company tax return, the court said: "The fact that petitioner had no fraudulent intent and that its status was in *substantial doubt* do not excuse its non-compliance." (Emphasis supplied.) The personal good faith belief that the taxpayer is not required to file an excess profits tax return is insufficient alone to discharge the addition to tax under section 291 (a). *Fides* v. *Commissioner*, 137 F. 2d 731 (C. A. 4, 1943); *Nirosta Corporation*, 8 T. C. 987, 990 (1947); *West Side Tennis Club*, 39 B. T. A 149 (1939). Taxpayers deliberately omitting to file returns must use reasonable care to ascertain that no returns were necessary. We think the petitioner did not use such care. Here there is no evidence that petitioner's officers had reliable information (or, in fact, any information) that its share of the joint venture earnings was less than the statutory exemption and that the filing of a return was, therefore, not required. Likewise, there is no evidence that petitioner, in reliance upon competent advice of an individual qualified to assist on tax matters, came to the conclusion that excess profits tax returns were not required. See *Estate of Michael Collino*, 25 T. C. 1026, 1036 (1956). In the absence of such evidence, mistaken belief on the part of petitioner that no return was required under the statute does not constitute reasonable cause for noncompliance. *P. Dougherty Co.*, 5 T. C. 791, affd. 159 F. 2d 269 (C. A. 4, 1946), certiorari denied 331 U. S. 838; *Heatbath Corporation*, 14 T. C. 332, 348 (1950).

Petitioner argues on reply brief that every effort was made to obtain income figures from Beattie, but without success, and it "fully advised respondent of the situation." The fact that petitioner informed the respondent on its regular corporate returns (Form 1120) filed for 1944 and 1945 that it was involved in litigation with a co-venturer and therefore could not ascertain its distributive share of profits is clearly inadequate to apprise the respondent that excess profits were also due. A separate return (Form 1121) was explicitly required by Congress. It is well settled that disclosure of the facts in the wrong return is not sufficient to place the respondent on notice that the tax is due and does not relieve the putative taxpayer from additions to tax under section 291 (a). *Commissioner* v. *Lane-Wells*, 321 U. S. 219 (1944).

In the light of the foregoing and the record as a whole, we are convinced that the petitioner has not shown a reasonable cause for failure to file excess profits tax returns for 1944 and 1945.

*Decision will be entered under Rule 50.*