T.C. Memo. 2001-136

UNITED STATES TAX COURT

LARRY M. LEVY AND DIANE LEVY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11657-99.                    Filed June 8, 2001.

Larry M. Levy and Diane Levy, pro sese.

<u>Kenneth C. Peterson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice dated March 25, 1999, respondent
determined deficiencies in and penalties on petitioners' Federal
income taxes as follows:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 1991 | $17,334 | $3,467 |
| 1992 | 27,024 | 5,405 |
| 1994 | 48,671 | 9,734 |

Unless otherwise indicated, all section references are to the

Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for determination are whether petitioners are: (1) Entitled to deduct, in 1991, certain advances made to Jensen Talbert Fine Jewelers, Inc. (JTFJ); (2) entitled to deduct, in 1991, payments made pursuant to personal guaranties of JTFJ debt; and (3) liable for the section 6662 accuracy-related penalty.

FINDINGS OF FACT

When the petition was filed, Larry and Diane Levy resided in Newport Beach and Torrance, California, respectively.

I. Background

JTFJ owned and operated the Jensen Talbert Fine Jewelry Store (the store). Robert Levy, Larry Levy's father, was the sole shareholder of JTFJ.

Prior to 1985, Diane Levy worked as a salesperson in the store. In 1985, she began managing the store's day-to-day operations (i.e., she supervised employees, acted as lead salesperson, and purchased inventory). Diane Levy received wages of $7,838, $10,125, $6,160, $11,480, and $13,720 in 1982 through 1986, respectively.

Prior to 1985, Larry Levy began making advances to JTFJ. By May 2, 1985, Larry Levy had advanced $53,250 to JTFJ. In 1985, Larry Levy started working for JTFJ. He worked for JTFJ an

average of 20 hours per week (40 hours per week during the peak retail periods) from 1985 through 1987 and more than 20 hours per week from 1987 through 1989. He provided financial, sales, and management services to JTFJ. From 1985 through 1989, JTFJ did not compensate him for his services. During 1990 through 1995 he worked for, and received wages from, American Laser Corporation, California JAMAR, Inc., and JAMAR Industries. During 1991 and 1992, Larry Levy operated a consulting business, raising capital for, but not advancing funds to, his client corporations.

II.  The Note and The Agreement

On May 2, 1985, Robert Levy, as president of JTFJ, executed a note (the note), which was secured by JTFJ's assets but subordinated to "all current or future financial obligations to Republic Bank." The security interest in JTFJ's assets was not perfected. Payment of principal and accrued interest was due on or before May 1, 1988.

On May 2, 1985, Larry Levy, Robert Levy, and JTFJ, executed the Joint Venture Agreement (the agreement) to provide cash-flow for JTFJ. The agreement provided that Larry Levy make additional advances to JTFJ, guarantee corporate debts, and deliver professional services relating to JTFJ's operations and continuing capital needs. In exchange, he would receive a 50-percent interest in JTFJ's profits, which was payable at his discretion, after the advances were repaid. Further, pursuant to

the agreement, JTFJ reimbursed $15,442 of expenses Larry Levy incurred on behalf of JTFJ. The agreement characterized all of Larry Levy's advances as loans. Petitioners' advances were all made directly to JTFJ.

By May 1987, JTFJ was unable to pay its bills as they became due. Between May 1987 and April 1988, Larry Levy advanced an additional $187,096. On May 1, 1988, the note was not paid as required by its terms.

III. Advances and Bankruptcy

On May 5, 1988, JTFJ filed for protection under chapter 11 of the Bankruptcy Code. The bankruptcy court's file was subsequently lost. After the bankruptcy filing Larry Levy continued to advance funds to JTFJ (i.e., an additional $92,076 between May 1988 and March 1990). By March 31, 1990, Larry Levy had advanced $599,077 to JTFJ (i.e., $48,250 prior to March 31, 1985, and $130,000, $141,655, $174,696, $80,754, and $23,722 in JTFJ's taxable years ending March 31, 1986 through March 31, 1990, respectively). Of these advances, $125,000 of the $599,077 was memorialized by a written note.

Pursuant to the agreement, Larry Levy guaranteed a number of JTFJ's debts. From 1988 through 1993, petitioners paid $199,426 on the personal guaranties made to JTFJ's creditors (i.e., $1,000 in 1988, $37,095 in 1989, $53,806 in 1990, $93,725 in 1992, and $13,800 in 1993).

Larry Levy filed a claim as a creditor in JTFJ's bankruptcy proceeding.  During the bankruptcy, he agreed to subordinate his claim to that of Betty Jo Byers.  Ms. Byers was a JTFJ creditor and former bookkeeper who lent $42,500 to JTFJ.  Larry Levy personally guaranteed the loan.  Ms. Byers received $26,008.86 from Larry Levy, pursuant to a judgment and subsequent garnishment of his wages.

In August 1989, the bankruptcy court ordered the sale of JTFJ's assets to Majestic Jewelers.  Majestic Jewelers agreed to pay the bankruptcy trustee $200,000 for JTFJ's assets (i.e., $50,000 at the time of purchase and the remainder in installments).  Majestic Jewelers' payments would go to JTFJ's secured creditors, first to Republic Bank and then to petitioners.  On November 20, 1989, the chapter 11 case was converted to a chapter 7 case.  In 1991, after making only a few small payments, Majestic Jewelers defaulted on its obligations.  After Majestic Jewelers defaulted, petitioners were, pursuant to Larry Levy's personal guaranty, required to repay $103,622 to Republic Bank.  Pursuant to the bankruptcy plan, petitioners would have received the remaining payments.  Petitioners deducted $445,104 as business bad debt on their 1991 tax return and claimed a net operating loss carryover on their 1992 and 1994 tax returns.

OPINION

Respondent determined that the advances and guaranty payments were capital contributions to JTFJ, entitling petitioners to a short term capital loss deduction in 1989, and a short-term capital loss carryover deduction of $3,000 per year in 1991, 1992, and 1994.  Petitioners contend that they are entitled to a section 166 business bad debt deduction of $445,104 in 1991.  In the alternative, petitioners contend that they are entitled to deduct these payments as section 165 losses, or as section 162(a) ordinary and necessary business expenses.

I.   The Joint Venture

Petitioners contend that they are entitled to an ordinary deduction because the advances to JTFJ and guaranty payments were made pursuant to a joint venture.  Petitioners further contend that the entity became worthless in 1991.

A joint venture has been defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.  See Beck Chem. Equip. Corp. v. Commissioner, 27 T.C. 840, 848 (1957).  Whether an entity will be recognized as a joint venture for tax purposes is determined by reference to the same principles that govern recognition of a partnership.  See Luna v. Commissioner, 42 T.C. 1067, 1077 (1964) (stating that the

parties' agreement and conduct shall be closely scrutinized).
The inquiry is

> whether, considering all the facts--the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent--the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * [Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); fn. ref. omitted.]

This was not a joint venture. Larry Levy and Robert Levy did not come together to make a profit. The agreement merely formalized the parties' previous actions, where Larry Levy advanced money to JTFJ in exchange for an interest in the profits. Moreover, the alleged joint venture did not transact business, obtain a taxpayer identification number, file partnership tax returns, maintain bank accounts, or receive income or incur expenses. Further, the parties to the agreement did not report the pass-through of any income or loss. Accordingly, we conclude that the advances were not made through a joint venture, and petitioners are not entitled to deduct them as a loss on the worthlessness of a partnership interest.

II. Bad Debt Deduction

In the alternative, petitioners contend that they are entitled, pursuant to section 166, to a 1991 business bad debt loss for their advances and payments on personal guaranties.

Respondent contends that the advances and guaranty payments were capital contributions to JTFJ. Respondent further contends that, even if they were loans, petitioners were not engaged in a trade or business that would allow these payments to be characterized as business bad debts.

Section 166 allows a deduction for any debt that becomes worthless during the taxable year and distinguishes between business and nonbusiness bad debts. A business bad debt is a debt that is proximately related to the taxpayer's trade or business. See Whipple v. Commissioner, 373 U.S. 193, 201 (1963); sec. 1.166-5, Income Tax Regs. Nonbusiness bad debts are treated as short term capital losses and are subject to the section 1211 limitations on capital losses. See sec. 166(d)(2).

a. The Guaranty Payments

Petitioners were not in the trade or business of acting as a guarantor. Larry Levy's consulting business did not guarantee the debts of any corporation. See sec. 1.166-9(a), Income Tax Regs. In addition, the guaranties were not made to protect petitioners' trade or business as employees of JTFJ, because protection of their status as employees was not the dominant motivation for making the guaranties. See United States v. Generes, 405 U.S. 93, 103 (1972) (stating that to qualify for the business bad debt deduction the taxpayer's trade or business must be the dominant motivation for making the guaranties). Larry

Levy received no compensation for his services to JTFJ and Diane Levy's wages were very small in comparison to the amount of the loans guaranteed. See id. at 98-99 (considering the amount of salary to be protected in relation to the amount advanced). Petitioners' guaranty payments (i.e., $1,000 in 1988, $37,095 in 1989, $53,806 in 1990, $93,725 in 1992, and $13,800 in 1993) were made with a profit motive, the agreements were legally enforceable against petitioners, and the guaranties were, however, made before the obligations became worthless. See sec. 1.166-9(d), Income Tax Regs. The guaranty payments were worthless when made. Petitioners made only $93,725 of guaranty payments during the years in issue, all during 1992. Accordingly, petitioners are not entitled to deduct the guaranty payments in 1991. Petitioners, however, are entitled to deduct $93,725 as a 1992 nonbusiness bad debt.

b. The Advances

To determine whether a payment is a loan or a contribution to capital, numerous factors are considered. See Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); see also Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984) (stating that 11 factors are considered), revg. T.C. Memo. 1983-120. No individual factor is controlling, and the determination of whether advances are loans or contributions to capital requires

consideration of all of the circumstances.  See <u>Dixie Dairies</u>

<u>Corp. v. Commissioner</u>, <u>supra</u> at 493.

All of the interest on petitioners' advances was accrued,

not paid, and, with the exception of the note, there was no fixed

maturity date for repayment of the advances.  See <u>A. R. Lantz Co.</u>

<u>v. United States</u>, 424 F.2d 1330, 1333 (9th Cir. 1970) (concluding

that advances were an equity investment in similar

circumstances).  Further, petitioners agreed to subordinate their

interest to those of Republic Bank and Betty Jo Byers, whose debt

they had personally guaranteed, see <u>O.H. Kruse Grain & Milling v.</u>

<u>Commissioner</u>, 279 F.2d 123, 126 (9th Cir. 1960) (stating that

subordination to later incurred debt is an indication of equity

rather than debt), affg. T.C. Memo. 1959-110; made many advances

when JTFJ had no working capital, see <u>Datamation Servs., Inc. v.</u>

<u>Commissioner</u>, T.C. Memo. 1976-252 (stating that a transaction

appears to be a contribution to capital where advances are made

to provide working capital, and repayment depends solely on the

borrower's success); and participated in JTFJ's management, see

<u>O.H. Kruse Grain & Milling v. Commissioner</u>, <u>supra</u> at 126 (stating

that where the taxpayer participates in management, advances are

more likely capital contributions than debt).  Moreover,

petitioners made the advances in exchange for the future receipt

of a 50-percent interest in JTFJ's profits.  See <u>Aqualane Shores,</u>

<u>Inc. v. Commissioner</u>, 269 F.2d 116, 119 (5th Cir. 1959) (stating

that an equity investment is subject to the risks, but entitled to share in the profits of the venture), affg. 30 T.C. 519 (1958).

Accordingly, we conclude that $120,678 (i.e., the total 1991 deduction of $445,104 less the $199,426 in guaranty payments made by petitioners and the $125,000 lent pursuant to the note) was a contribution to capital and that petitioners are not entitled to a section 166 deduction. We further conclude that the $125,000 note was a bona fide loan. The loan evidenced by the note was legally enforceable. It was made with a profit motive, before the obligation became worthless, and not in the course of petitioners' trade or business. The debt became worthless upon Majestic Jewelers' default in 1991. Thus, the loss relating to the loan is deductible in 1991 as a nonbusiness bad debt.

III. Loss Deduction

Section 165(a) allows a deduction for certain losses sustained during the taxable year that are not compensated by insurance or otherwise.

Petitioners' capital interest in JTFJ became worthless in 1989, when JTFJ's assets were transferred to Majestic Jewelers for less than the amount of outstanding debt. Although petitioners were entitled to a capital loss deduction in that year, and a carryover, pursuant to sections 1211 and 1212, to the

years in issue, they are not entitled to the full deduction in 1991. See sec. 165(f).

## IV. Expense Deduction

Petitioners contend, in the alternative, that they are entitled to a section 162(a) deduction relating to an ordinary and necessary business expense. Section 162(a) provides that a taxpayer engaged in a trade or business may deduct all ordinary and necessary expenses. Petitioners have failed to establish that JTFJ's corporate expenses were the ordinary and necessary expenses of their trade or business. Petitioners, therefore, are not entitled to deduct the advances and guaranty payments as ordinary and necessary business expenses pursuant to section 162(a).

## V. Accuracy-Related Penalty

Respondent determined that petitioners were negligent in determining their 1991, 1992, and 1994 liabilities and are liable for a section 6662 penalty. The penalty applies to the portion of petitioners' underpayment that is attributable to negligence or disregard of rules or regulations. See sec. 6662(b)(1). Petitioners, relying on the advice of an attorney and an accountant, made a reasonable attempt to accurately report their bad debt deduction. See sec. 6664(c). As a result, petitioners are not liable for the accuracy-related penalty.

Contentions we have not addressed are moot, irrelevant, or meritless.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.