Intervest Enterprises, Inc., Rand American Fund, Inc., Intervest and Associates, Inc., and Little Theatre, Inc. v. Commissioner.
Intervest Enterprises, Inc. v. Commissioner
Docket No. 3936-68.
United States Tax Court
T.C. Memo 1971-245; 1971 Tax Ct. Memo LEXIS 87; 30 T.C.M. (CCH) 1056; T.C.M. (RIA) 71245; September 27, 1971, Filed. *87 John Anthony Smith and Ralph E. Lerner, 666 Fifth Ave., New York, N. Y., for the petitioners. Marlene Gross, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies in and additions to petitioners' consolidated income tax: Addition
Addition
to tax
to tax
Taxable year
(Sec.
(Sec.
ended
Deficiency
[1] 6651(a))
6653(a))
Jan. 31, 1963
$ 934.55
$233.64
Jan. 31, 1964
120,104.00
$6,005.20
Subsequently, by amended answer, respondent has asserted an increased deficiency in income tax for the taxable year ended January 31, 1963 in the amount of $49,897.46 and an increased addition to the tax under section 6651(a) in the amount of $12,474.36. The issues before us are: (1) the amount and character of the gain realized by petitioner Intervest and Associates, Inc., as a result of its transactions and dealings with the Government of Northern Nigeria (hereinafter sometimes referred to as the "Nigerian project" or "Gusau project"); (2) whether any portion of said gain is properly taxable to Intervest and Associates, Inc., in its taxable year ended January 31, 1963 rather *88 than in the taxable year ended January 31, 1964, as reported by petitioners; (3) the amount of allowable consolidated deductions of petitioners for the taxable year ended January 31, 1963; (4) whether Intervest and Associates, Inc., owned 80 percent or more of all classes of the stock of Little Theatre, Inc., at any time during the taxable year ended January 31, 1964; and (5) whether any part of the underpayment of tax for the taxable year ended January 31, 1964 was due to negligence or intentional disregard of respondent's rules and regulations. [2]
General Findings of Fact Some of the facts have been stipulated. The stipulation *89 of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners are all New York corporations having their principal places of business in New York, New York, at the time they filed the petition herein. The consolidated corporation income tax return of petitioners Intervest Enterprises, Inc. (hereinafter sometimes referred to as "Enterprises"), Rand American Fund, Inc., and Intervest and Associates, Inc. (hereinafter sometimes referred to as "Associates"), for the taxable year ended January 31, 1963 was filed with the district director of internal revenue, New York, New York. The consolidated corporation income tax return of the aforementioned corporations plus Little Theatre, Inc., for the taxable year ended January 31, 1964 was filed with the district director of internal revenue, New York, New York. Issues 1, 2, and 3. The Project and Allowable Consolidated Deductions for the Taxable Year Ended January 31, 1963 Findings of Fact Petitioner Intervest Enterprises, Inc., was incorporated under the name Intervest, Inc. on or about February 6, 1961. On or about December 7, 1961, said petitioner's name was changed to Intervest Enterprises, Inc. *90 No stock other than three original subscription shares was issued by Enterprises. Roger Euster, Leonard Tow, and Leonard 1058 Moore each received one of the three subscription shares. Euster was named president of the corporation and Tow and Moore were named vice presidents. After its incorporation, Enterprises engaged in public relations work in Africa and did preliminary work on the establishment of a mutual fund in South African gold shares. In 1961, Leonard Tow presented to representatives of the Government of Northern Nigeria a proposal for the construction and operation of a textile mill in Northern Nigeria. In so doing, he represented the Thomas Meikles Trust of Southern Rhodesia, Strongweave Textiles of South Africa and Southern Rhodesia, and Intervest, Inc. The three companies were known to the Nigerians as the Intervest group. The proposal consisted of a letter of intent, dated October 28, 1961, over the signature of Tow as vice president of Intervest, Inc., and was supported by projections, descriptions of capital equipment to be installed, factory designs, lists of managers, time schedules, etc. The letter of intent proposed "a joint venture" between the Intervest group *91 and the Government of Northern Nigeria for the construction, equipping, and managing of a cotton spinning and weaving mill in the Northern Region, with both parties participating in such venture as "equal partners" and participating equally in the financing of the project. It suggested that a meeting be held before November 15, 1961, "at which time articles of agreement will be worked out and initialed." On November 7, 1961, the Intervest group and the Government of Northern Nigeria entered into the following written understanding: Gusau Industrial Corporation The Government of Northern Nigeria and the Intervest Inc. Group (consisting of representatives of Thomas Meikles Trust, Cotton Printers Ltd., of Rhodesia, Strongweave Textile Mills and Intervest Inc., U.K. Interests) agree to proceed with an industrial venture at Gusau in Sokoto Province of Northern Nigeria of 5 m. capital, the first stage of which involves the immediate call up of 1 m. 2. It is agreed that this stage is on a 50/50 basis, the Northern Regional Government agrees to arrange for the provision of a Bankers credit - probably in the form of an Irrevocable Letter of Credit - for the purpose of paying for spinning, *92 weaving and finishing textile equipment up to a value of 500,000. The Intervest Group agrees to ship up to 1 m. value of machinery under the terms of Heads of Agreement which will be signed in not more than two calender [sic] months by the participating parties. 3. It is agreed further that the Letter of Credit will only be drawn down against Shipping Documents under which textile machinery is consigned to the Gusau Industrial Corporation in formation at the rate of 50 per cent of the value of each shipment; the balance to be provided by the Intervest Group. /s/ Permanent Secretary, Ministry of Trade & Industry Government of Northern Nigeria
7th November, 1961. /s/ Leonard Tow Vice President Intervest Inc.
7th November, 1961. /s/ Thomas Meikles Trust 7th November, 1961. /s/ Strongweave Textile Mills 7th November, 1961. The agreement was drafted by the Permanent Secretary of the Ministry of Trade and Industry of the Government of Northern Nigeria. Immediately thereafter, the Government of Northern Nigeria was advised and understood that the Intervest group would conduct its affairs in the form of Intervest and Associates, Inc., and thereafter the Government of Northern Nigeria dealt *93 only with Intervest and Associates, Inc. On November 28, 1961, in Lagos, Nigeria, Euster, Tow, and Moore signed a Certificate of Incorporation for petitioner Intervest and Associates, Inc., subscribing to one share of stock each, and then forwarded the certificate to their New York counsel, who filed it with the New York Secretary of State on December 7, 1961. Sometime in December of 1961, the Southern Rhodesian and South African members of the Intervest group withdrew therefrom after a disagreement as to where the required mill equipment should be purchased, they being in favor of purchases in England, Scotland, or Ireland and Associates being of the view that American machinery would be better suited for the intended purpose. 1059 Shortly after the November 7, 1961 document was signed, Tow proceeded to draft the Heads of Agreement. This latter document provided for the establishment of Gusau Industrial Corporation (Nigeria) Ltd., with an authorized capital of 1,000 shares having a par value of 1, 500 shares of which were to be subscribed for and issued to the Northern Regional Marketing Board and 500 shares to Associates. Additional first-stage financing was to be in the form *94 of 1,000,000 seven-year, 7-percent bonds to be subscribed for and issued equally in the same fashion. Total financing of 5,000,000 was to be supplied equally by the Government of Northern Nigeria and Associates. The provisions of the November 7, 1961 document, relating to the letter of credit, were incorporated into the agreement as well as detailed arrangements relating to composition of the board of directors, share transfers, disposition of earnings, the land, buildings, and services to be provided, legislation, customs, and supply of raw materials. As a supplement to the Heads of Agreement, a further agreement was prepared for execution by Gusau Industrial Corporation (Nigeria) Ltd. and Associates, whereby the latter was to be the Managing Agent of the company for a period of twelve years. In that capacity, Associates was to deal with all matters in connection with the final planning of the factory, the purchase of machinery and equipment, and the provision of technicians to supervise the building of the factory and the installation of the machinery and equipment and to manage the maintenance and operation of the factory, including the hiring and firing of employees, purchases, *95 sales, contracts, keeping of accounts, etc. The agreement provided that, as compensation, Associates was to receive 5,000 for its services in getting the factory running and 10,000 annually thereafter for managing the operations. The Heads of Agreement and further agreement were never signed due to political upheavals in Northern Nigeria and the death of almost all of the representatives of the Government of Northern Nigeria with whom Associates had dealt. Pursuant to negotiations subsequent to the execution of the November 7, 1961 document, the Government of Northern Nigeria arranged with the Bankers Trust Company, London, England, for the issuance of a confirmed Irrevocable Letter of Credit in favor of Associates in the amount of 500,000 sterling. Said Letter of Credit covered the purchase of textile machinery to a value of 1 million C.I.F. Lagos/ Apapa or other Nigerian port or ports, payment to be made to the extent of 50 percent of the invoice value of each shipment and against the surrender of documents specified therein. Euster, Tow, and Moore, as representatives of Associates, purchased textile machinery and equipment in the name of Associates or in their own names, which *96 was crated, assembled in United States ports, and loaded on ships for transfer to Nigeria. Pursuant to the Letter of Credit, Associates invoiced the machinery and equipment to the Gusau Industrial Corporation, presented the invoices on each shipment to the Bankers Trust Company, and drew down 50 percent of the invoice value of each shipment. In determining the invoice value of each shipment, Associates took into account the actual cost of the machinery plus the cost (actual, to the extent already incurred, and estimated, to the extent that such amounts had not yet been incurred) of packing, loading, shipping to ultimate destination, unloading, assembly, etc. The following drawings were made against the Letter of Credit on or about the dates and in the amounts indicated: Date
[3] Pounds
2/12/62
4,284
3/8/62
8,925
3/20/62
35,700
3/21/62
30,345
3/23/62
35,700
3/26/62
41,055
4/12/62
[4] *97 121,003/10 In April 1962, the Government of Northern Nigeria (as it was by that time reconstituted) filed a complaint against Associates in the Supreme Court of the State of New York in which it sought an order enjoining Associates from presenting any further drafts against the previously referred to Letter of Credit and damages of $436,833.60, representing the amount which Associates had drawn down under the Letter of Credit. The complaint alleged, inter alia, that no contract was entered into among the parties as contemplated, or otherwise; that the Government 1060 of Northern Nigeria had established a confirmed irrevocable Letter of Credit in the expectation that a contract would be entered into among the parties; that, at the time of the establishment of the Letter of Credit, the parties did not contemplate that any machinery would be shipped to Nigeria or any amounts drawn pursuant to the Letter of Credit unless and until a contract was entered into; that the Government of Northern Nigeria, upon learning of the intended shipments, notified Associates to cancel all arrangements for shipment; and that, on or about February 6, 1962, Associates shipped machinery and drew *98 against the Letter of Credit and was continuing to do so. Negotiations between the parties in London in May of 1962 led to a signed Memorandum dated May 4, 1962, embodying the principles governing settlement of the controversy. Under the Memorandum, an independent auditor was to review Associates' books and submit a report with respect to all of the latter's transactions in connection with the Gusau project. Upon receipt of the auditor's report, the Government of Northern Nigeria was to pay Associates an amount (not in excess of $604,000) equal to the total of: (a) all expenditures and obligations paid or incurred by Associates in connection with the Gusau project, less (i) all amounts theretofore or thereafter reimbursed to Associates in connection with said project, and (ii) all unpaid obligations directly connected with such textile machinery which the Government of Northern Nigeria might elect to pay directly to the obligee; plus (b) the sum of 30,000 sterling ($84,000). All sums theretofore paid to Associates under the irrevocable Letter of Credit (except the amount in the escrow account, see footnote 4, supra) were to be credited to the Nigerians against the aforementioned obligations. *99 In addition, the Government of Northern Nigeria, or a corporation designated by it, was to take title to all mill machinery and related equipment and materials theretofore shipped to Nigeria by Associates and consigned to the Gusau Industrial Corporation. Upon consummation of the settlement, each party was to "be released from all claims of, all obligations to, and other legal relations with the other." The auditor engaged pursuant to the settlement agreement (S.D. Leidesdorf & Co.) made the audit and submitted a report dated November 8, 1962. On February 7, 1963, the Government of Northern Nigeria and Associates entered into a letter agreement pursuant to which all aspects of the dispute between them were disposed of on the basis of the London Memorandum and the Leidesdorf report as adjusted by subsequent negotiations. Under the letter agreement, $65,137.53 was to be paid to Associates out of the escrow account at the Bankers Trust Company. This amount was computed as follows: $ 89,413.15
(Leidesdorf report, Schedule 2)
313,023.94
(Leidesdorf report, Schedule 1)
add 1,130.38
(Westbury Hotel)
add 3,003.50
(Savory - additional payment)
15,141.56
(Legal fees)
$421,712.53
less 3,750.00
(Reduction of item of officers
salaries)
$417,962.53
add 84,000.00
(London memorandum, par. 3 (!))
$501,962.53
less 436,825.00
(Amount drawn under credit
and retained)
$65,137.53
Total proposed payment
*100 On February 8, 1963, pursuant to Associates' instructions, $15,141.56 of the $65,137.53 payment called for by the February 7, 1963 agreement was paid to the attorneys for Associates and $49,995.97 was paid to Associates. Thereafter, Associates had no further dealings with the Government of Northern Nigeria. The total amount actually received under the Letter of Credit by Associates in connection with the Gusau project was $503,990.02. The difference between this sum and the $501,962.53 shown in the settlement agreement represents gain realized by Associates on the conversion of pounds sterling into dollars. The total amount received by Associates in the taxable year ended January 31, 1963 was $438,852.49. In fiscal 1964, Associates received $65,646.67. This amount consists of the payment mentioned in the February 7, 1963 agreement plus an additional $509.14 in refunds received in that year. Total expenditures paid or accrued by Associates prior to fiscal 1964 which are properly chargeable to the Gusau project were $258,604.12, computed as follows: 1061 Amounts taken into account from Leidesdorf report -
Purchases of equipment
$108,278.00
Freight and shipping
83,859.55
Trucking, rigging, and crating
30,901.78
Insurance 7,286.77
Subtotal
[5] *101 $230,326.10
Additional amounts not picked up in Leidesdorf report -
Packing and rigging
$ 473.75
Freight
5,000.00
Unloading at Nigeria
19,673.03
International Basic Economy Corp
200.00
Crown Cotton Mills
11,000.00
Refunds (17,423.03)
Subtotal
18,923.75
Investigation expenses relating to the Nigerian project - 9,354.27
Grand total
$258,604.12
The total amount paid or accrued by Associates in fiscal 1964
is $20,776.57, computed as follows:
Legal expenses of settlement
$15,141.56
Expenditures by Little Theatre, Inc., for associates'
account 5,635.01
Total
$20,776.57
Associates' total gain from its dealings with the Government of Northern Nigeria was $225,118.47. Of this amount, $180,248.37 was realized in fiscal 1963 and $44,870.10 was realized in fiscal 1964. From February 6, 1961 to January 31, 1962, Intervest Enterprises, Inc., and Rand American Fund, Inc., expended or accrued an aggregate amount of $11,405.54 representing travel, telephone, office, rent, entertainment, and commission and fee expenses on behalf of Associates and relating to the Nigerian project. In their 1963 income tax return, the foregoing amount was claimed as part of the consolidated expenses for said taxable year. The breakdown of this amount among the various items involved and the allocations to the pertinent fiscal period are shown by the following table: Period
Dec. 7, 1961
Total
prior to
through
pre-fiscal-
Expense
Dec. 7, 1961
Jan. 31, 1962
1963 amounts
Rent
$ 945.00
$ 405.00
$ 1,350.00
Commissions and fees
558.00
192.00
750.00
Telephone
988.38
360.00
1,348.38
Travel and entertainment
5,362.89
394.27
5,757.16
Office, legal, and audit 1,500.00
700.00
2,200.00
Total
$9,354.27
$2,051.27
$11,405.54
*102 Ultimate Finding of Fact Associates and the Government of Northern Nigeria were not engaged in a joint venture in respect of the Gusau project. The gain realized by Associates as a result of the transaction constituted a combination of reimbursement of expenditures previously made or obligations incurred and payments as compensation for services rendered and in lieu of anticipated compensation for services to be rendered. Opinion The Nigerian project involves three factual questions: (1) the character of gain, i.e., capital gain or ordinary income, (2) the amount of the gain, and (3) the proper year or years of its taxability. Petitioners contend that Associates and the Government of Northern Nigeria were joint venturers, that Associates' interest was a capital asset, that it sold that interest to the Government of Northern Nigeria 1062 in fiscal 1964, and that its gain should be considered long-term capital gain realized in that year. Respondent's position is that no joint venture ever existed, that all gain realized by Associates was ordinary income, and that a major portion of that gain is taxable in fiscal 1963 and the balance in fiscal 1964. We agree with respondent. We see *103 no purpose to be served in analyzing the various elements involved in a determination whether a joint venture exists. See Hubert M. Luna, 42 T.C. 1067, 1077-1079 (1964); Beck Chemical Equipment Corporation, 27 T.C. 840, 848-849 (1957). Our findings of fact set forth in detail the arrangements between the Intervest group and the Government of Northern Nigeria. In our view, these arrangements did not create a joint venture during the taxable periods in question; they simply created a mere contract to form a corporation which would construct and operate a textile mill and on behalf of which the Intervest group would have certain operational, supervisory, and managerial responsibilities. [6] *105 Among these responsibilities were the performance of services in purchasing equipment under the Letter of Credit, getting the factory in operation, and thereafter in running the factory. To be sure, the precise nature of the arrangements is set forth in the Heads of Agreement and the supplement thereto which were never signed, but it appears that the nonexecution of these documents resulted from unanticipated extraneous events and not from lack of acceptance of their terms by the parties. The documents *104 are therefore persuasive evidence of the relationships which the parties intended. Moreover, we note that the phrase "joint venture" appears only in the unilateral proposal of October 28, 1961, signed only by Tow on behalf of the Intervest group. The phrase does not appear in the November 7, 1961 written understanding, the Heads of Agreement, the complaint filed by the Government of Northern Nigeria in the New York Supreme Court, or any of the settlement documents. [7] During the period November 1961 to March 1962, Associates proceeded to purchase equipment for the Nigerian project under the Letter of Credit which had been established. By including a variety of actual and estimated expenses, it ballooned the invoice value thereof to an amount approximately twice its actual cost including direct shipping charges. In this fashion, Associates sought to bootstrap itself into a substantial profit without any financial risk. We need not concern ourselves with determining whether the Letter of Credit authorized drawings by Associates in this or any other fashion. It is sufficient to note that the Government of Northern Nigeria contended that it did not in the action brought for an injunction and damages which led to the settlement that was ultimately made. Against the foregoing summary background and on the *106 basis of the record as a whole (keeping in mind that petitioners have the burden of proof on this issue), we are not convinced that the settlement between Associates and the Government of Northern Nigeria represented anything more than a confirmation of the right of Associates to retain the amounts previously drawn down under the Letter of Credit, plus an additional $65,137.53, as reimbursement for expenditures previously made or obligations incurred and as payment of compensation for services rendered and to be rendered. We are unable to discern any property interest, by way of a participation in a joint venture or otherwise, which can be considered a capital asset entitling Associates to capital gain treatment with respect to any portion of the gain realized from the settlement. For tax purposes, amounts received in settlement of litigation are classified in accordance with the nature and basis of the claims which are compromised. Commissioner v. Murdoch, 318 F. 2d 414, 416 (C.A. 3, 1963); Fowler Hosiery Co.36 T.C. 201, 224 1063 (1961), affd. 301 F. 2d 394 (C.A. 7, 1962). Accordingly, we hold that the entire gain is ordinary income. Compare Morse v. United States, 371 F. 2d 474, 482-483 (Ct. Cl. 1967); *107 Benton v. Commissioner, an unreported case ( C.A.D.C. 1964, 13 A.F.T.R. 2d 796, 64-1 USTC 9323), affirming per curiam a Memorandum Opinion of this Court; Harry L. Booker 27 T.C. 932 (1957); Armstrong Knitting Mills, 19 B.T.A. 318 (1930). We turn now to a determination of the amount of the gain which petitioners are required to report as ordinary income. Initially, we note that the parties are now in agreement with the gross amounts shown in our findings of fact as having been received by Associates - namely, $438,852.49 drawn down under the Letter of Credit in fiscal 1963, and $65,137.53 received in fiscal 1964 plus an additional $509.14 in refunds received in that year. The parties are also in agreement that the taxable portion of these gross amounts depends upon how much constituted reimbursement for expenditures previously made or obligations incurred which are properly chargeable to the Gusau project. The parties are, however, in disagreement as to items which enter into the calculation of those expenditures and it is to this issue that we direct our attention, [8] *108 setting forth only such elaboration as is necessary to an understanding of our findings of fact. We have found that such expenditures prior to fiscal 1964 aggregated $258,604.12. The following items require explanation: (1) Respondent claims that $11,405.54 was improperly deducted on the fiscal 1963 return as being investigatory expenditures and that petitioners have not shown that these are properly chargeable to the Gusau project. We agree with respondent that these amounts are not deductible in fiscal 1963. [9] However, we have found that $9,354.27 of this amount was expended in connection with that project prior to the organization of Associates. In this frame of reference, although clearly not deductible in fiscal 1963, this amount is properly chargeable to petitioners' costs. [10] Cf. Richmond Television Corporation v. United States, 354 F. 2d 410, 414 (C.A. 4, 1965); WHEC, Inc. 37 T.C. 821 (1962); Mid-State Products Co., 21 T.C. 696, 714 (1954); Charles T. Parker, 1 T.C. 709 (1943); Rev. Rul. 55-442, 1955-2 C.B. 529; Fleischer, "The Tax Treatment of Expenses Incurred in Investigation for a Business or Capital Investment," *109 14 Tax L. Rev. 567, 595 (1959). As to the balance of $2,051.27, these items were incurred subsequent to the formation of Associates but still in the pre-fiscal-1963 period and therefore are not deductible in the fiscal year before us. Moreover, since they represent deductible post-opening operating expenses, they cannot properly be considered as chargeable to the costs of the Gusau project for purposes of this case. (2) Respondent erroneously took into account payments of $1,130.49 to Smith & Kelly Co., which schedule 4 of the Leidesdorf reports indicates were accounted for as refunds, and he erroneously failed to include $5,326.97 of unloading expense which appears on schedule 4 of that report. (3) Respondent's contention that petitioners failed to take account of two refunds totalling $1,106.71 is incorrect, because these two were accounted for on schedule *110 4 of the Leidesdorf report in determining the net payments made to Fred E. Gignoux and Tarver Shipping Co. Our findings of fact show that $20,776.57 was paid or incurred by Associates during fiscal 1964. Petitioners claim that certain payments made by Little Theatre, Inc., for the account of Associates to J. Hickman ($3,750) and D. Singh ($3,124) should also be taken into account. We are satisfied that these payments related to transactions other than the Gusau project. There remains the question as to whether all of the gain which is taxable to petitioners as ordinary income was properly reportable by petitioners in fiscal 1964 or whether part thereof should be included in income for fiscal 1963. Originally, respondent asserted a deficiency with respect to the Nigerian project only for fiscal 1964 but, in an amended answer herein, he asserted that a large portion of the gain was taxable in fiscal 1963. Such being the case, 1064 respondent has the burden of proof as to this issue. Rule 32, Tax Court Rules of Practice; Estate of Tony Cordeiro, 51 T.C. 195, 203 (1968). Concededly, the formalization of the settlement did not occur until February 7, 1963. But the fact is that during *111 fiscal 1963 Associates had withdrawn $438,852.49 under the Letter of Credit for its own account and at all times claimed the right to do so and to retain said sums. Even if we assume that ultimately Associates could be called upon to account for its withdrawals to the Government of Northern Nigeria, by no stretch of the imagination can it be said that the sums withdrawn were impressed with a trust pending any such accounting. Moreover, as early as May 4, 1962, an agreement had been reached embodying the principles of a settlement which, among other things, provided for payment to Associates of all expenditures paid and obligations incurred by Associates in connection with the project, plus an additional agreed amount of $84,000. And by November 8, 1962, the auditor had submitted his report which specified an amount for such expenditures and obligations and which, together with the $84,000 item and without regard to the net additional adjustments of $15,525.44 in Associates' favor, exceeded the aggregate sums previously drawn down under the letter of credit. Under all the circumstances, we hold that respondent has sustained his burden of proof and that by January 31, 1963 whatever doubts *112 may have existed as to the right of Associates to retain the sums withdrawn during fiscal 1963 had disappeared. By way of recapitulation and in accordance with our findings of fact, we hold that Associates realized gain from the Nigerian project in the amount of $180,248.37 ($438,852.49 less $258,604.12) in fiscal 1963 and $44,870.10 ($65,646.67 less $20,776.57) in fiscal 1964. As a concomitant, we also hold that, of the $108,900.31 of consolidated business expenses claimed for the taxable year ended January 31, 1963, petitioners are entitled to deduct $97,494.77. Issue 4. Ownership of Little Theatre, Inc., Stock Findings of Fact By contract dated June 29, 1962, the New York Times Company agreed to sell to Roger Euster the premises at 238-244 West 44th Street, New York, New York, for a total purchase price of $850,000. Of this amount, $25,000 was paid by Euster upon the signing of the contract. Thereafter, in August 1962, petitioner Little Theatre, Inc., was formed. The certificate of incorporation authorized 12,020 shares of common stock having a par value of $1 per share. Roger Euster, Leonard Tow, and William M. Wilson were the incorporators, and each agreed to subscribe to one *113 share of stock. At the first meeting of the board of directors, held on August 10, 1962, Leonard Tow and William M. Wilson assigned their subscription rights to Roger Euster. The latter was elected president, Leonard B. Moore, executive vice president, and Leonard Tow, treasurer of the corporation. At this first meeting, the corporation accepted Euster's offer to assign his rights under the contract with the New York Times Company (which contract required Euster to make a second payment of $25,000 in advance of closing) and under a mortgage loan commitment in the sum of $100,000 in consideration for repayment by Little Theatre, Inc., to Euster of the $2,000 mortgage loan commitment fee, the issuance to him of 2,000 shares of common stock, and the issuance to one Daniel A. Brenner of 120 shares of common stock (which were issued in the name of Brenner & Lewis Co.), all of said shares to be subject to an escrow arrangement with Bankers Trust Company. The corporation also granted to Euster an option on 4,020 shares of its common stock. The above agreement was subject to the successful public offering of Little Theatre, Inc., stock. The agreement with Bankers Trust Company provided that *114 the 2,000 shares of Little Theatre, Inc., common stock registered in the name of Roger Euster and the 120 shares of common stock registered in the name of Brenner & Lewis Co. would be held in escrow as provided in an escrow agreement to be furnished by October 25, 1962 and that if said escrow agreement were not furnished by that date the shares would be cancelled and returned to Little Theatre, Inc. On August 29, 1962, pursuant to the terms of the New York Times contract, Euster paid the additional $25,000 towards the purchase price of the property. In September or October of 1962, a public offering of 5,880 shares of Little Theatre, Inc., stock was attempted and failed. In connection therewith, an offering circular 1065 was prepared by the company. The circular indicated, inter alia, that Euster had paid $50,000 of his own money toward the purchase price of the Little Theatre, that he would not be reimbursed therefor, and that he would receive 2,000 shares of the company's stock in exchange for his rights under the New York Times contract and in consideration of his $50,000 cash investment. The circular further stated that if all of the stock offered thereunder was sold, Euster *115 would "own 25% of the outstanding stock of the Company for his cash investment of $50,000, and the public [would] own 73.5%." No mention was made in the circular of any subscription rights or other right to stock in favor of Associates. On November 5, 1962, the 2,000-share certificate registered in the name of Roger Euster and the 120-share certificate registered in the name of Brenner & Lewis Co. were cancelled and returned to petitioner Little Theatre, Inc. The closing on the premises at 238-244 West 44th Street was held on November 13, 1962. The closing statement reflects that the buyer was Little Theatre, Inc., and that the balance due and paid at the time of closing was $100,104.24. According to the stock certificate book, the following shares of Little Theatre, Inc., stock were issued and outstanding during the fiscal year ended January 31, 1964: Certificate No.
Record owner
No. of shares
Issuance date
1
Roger Euster
1
Fall 1962
2
Roger Euster
2,000
Fall 1962
8
Richard Scott Smith
10
1/28/63
9
John V. Gurry
39
12/3/63
10
Richard S. Smith
119
11/11/63
126
A. Gino Giglio
3
10/12/62
127
Louis Paul DeLuca
10
10/15/62
128
Brenner & Lewis
120
11/19/62
129
Arthur Paul Jacobs
50
11/19/62
130
Norman Gilbert Hickman
50
11/16/62
131
John V. Gurry
200
12/28/62
132
Allan Daniels
60
12/28/62
133
Arthur Paul Jacobs
150
1/11/63
135
Norman Gilbert Hickman
50
1/11/63
136-145
Intervest and Associates, Inc. 1,000 * *116 6/28/63
Subsequent to the unsuccessful public offering of Little Theatre, Inc., stock, the accountant for petitioners, after conversations with some of the principals involved, made adjusting journal entries which purported to capitalize a total of $104,000 of loans payable to Associates. Journal entries No. 16 and No. 17 of Little Theatre, Inc., for its taxable year ended December 31, 1962 show the following: 16 Loan payable - debit
$100,000
Capital stock - credit
$ 2,000
Capital surplus - credit
98,000
To capitalize loans @ $50 per share
17 - Loan payable - debit
$ 4,000
Capital stock - credit
$ 4,000
To record issuance of 4,000 shares
of stock at par value to original
subscriber.
Journal entry No. 25 of Intervest and Associates, Inc., for its taxable year ended January 31, 1963 shows the following: 25 - Investment - L.T. - debit $104,000 Loan - L.T. - credit $104,000 To record investment in Little Theatre. In no other fashion do the books and records of Little Theatre, Inc., reflect the existence of the loans from Associates which the aforementioned journal entries purported to capitalize. As of December 31, *117 1962, journal entries were made setting up loan accounts representing charges or advances made on behalf of Little Theatre, Inc., in the following amounts (to which we have added a summary description of the nature of the item): Balance from Cash Receipts Ledger Sheets
$ 14,652.00
Little Theatre journal entry No. 4
(payment of various expenses and
purchase of real estate by Intervest
Enterprises, Inc.)
9,301.88
Little Theatre journal entry No. 3
(payment of entertainment expense
by Rand American Fund, Inc.)
48.75
Little Theatre journal entry No. 2
(payment of various expenses by
Intervest and Associates, Inc.)
1,597.75
Little Theatre journal entry No. 5
(payment by Roger Euster of real
estate cost)
75,000.00
Little Theatre journal entry No. 9
(payment by Roger Euster of var-
ious expenses) $ 6,966.17
Total
$107,566.55
Cash advances by unrelated persons $3,750.00
Net Loans Payable to Related Par-
ties
$103,816.55 1066 None of the minutes of the meetings of the board of directors of Little Theatre, Inc., reflects any statement regarding the subscription to shares of Little Theatre, Inc., stock by Associates. Ultimate Finding of Fact At no time during the taxable year ended January 31, 1964 did Intervest and *118 Associates, Inc., or any of the other petitioners herein own 80 percent of the common stock of Little Theatre, Inc. Opinion Respondent contends that Little Theatre, Inc., did not qualify for the privilege of filing a consolidated return with the other petitioners involved herein for the taxable year ended January 31, 1964, because 80 percent of its common stock was not owned by any of said corporations at any time during that period. Accordingly, respondent disallowed a claimed $229,464.18 loss of Little Theatre, Inc., which petitioners sought to offset against the reported gain of Associates from the Nigerian project. Petitioners argue that Associates owned 80 percent or more of all classes of Little Theatre, Inc., stock at all times during the taxable year ended January 31, 1964. The making of a consolidated return is conditioned by statute upon membership in an affiliated group of corporations. Section 1501. An affiliated group is defined in section 1504(a). [11] *120 The question before us is whether Little Theatre, Inc. , stock possessing at least 80 percent of the voting power of all classes of said stock was owned directly by Associates or any of the other petitioners herein involved *119 at any time during the taxable year ended January 31, 1964. Petitioners' position is that, prior to the taxable year in issue, Little Theatre, Inc., had accepted a subscription for 6,000 shares of its stock from Intervest and Associates, Inc., in exchange for the cancellation of $104,000 in loans and advances made by Associates. According to petitioners, the greater portion of this $104,000 indebtedness arose from certain drawings under the Nigerian Letter of Credit made by Euster and used by him in making payments under the New York Times contract. The issue is one of fact and the burden of proof is on petitioners. Welch v. Helvering, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice. The record on this issue is extremely vague, confusing, and conflicting. The only evidence of the purported stock transaction in the books and records of Little Theatre, Inc., is the journal entries referred to in our findings of fact. Against this are a variety of factors, which at the very least create serious doubt as to whether these entries conformed to the basic facts: (1) There are no minutes or other documents formally authorizing the transactions indicated by the journal entries. Additionally, no explanation was given as to why 6,000 was selected as the number of shares to be recorded in the entries. (2) The public offering circular, dated September 17, 1962, contained no reference whatsoever to any interest of Associates or any other corporation *121 in the stock of Little Theatre, Inc. Moreover, contrary to petitioners' assertion that Euster used funds of Associates to pay for the shares issued to him, the circular indicates that, aside from the shares to be offered to the public, Euster was the owner of practically all of the remaining shares. Clearly, if, in fact, Associates had a right to receive shares at $1 per share pursuant to an original subscription, this would have been a material fact which should have been stated. The journal entries of loans or advances as of December 31, 1962 1067 indicate that $75,000 of a total of $103,816.55 owed by Little Theatre, Inc., represented Euster's payment of real estate cost. (3) The stock certificate book of Little Theatre, Inc., showed only 1,000 shares actually issued in the name of Associates. (4) The testimony of Euster, whom we found to be a credible witness, indicated that it was the intention of the parties that some, if not all, of the corporations in the group were to be owned by a partnership composed of himself, Tow, and Moore - i.e., that the relationship of the corporations was to be that of brother-sister rather than parent-subsidiary. His testimony is confirmed by *122 an agreement between Richard S. Smith, Leonard Moore, and Roger Euster, dated July 10, 1964, and is in direct conflict with that of Moore, We find it unnecessary to resolve which broad generalization as to corporate ownership should be accepted. At a minimum, Euster's testimony casts doubt upon petitioners' assertion as to the ownership of the requisite percentage of stock of Little Theatre, Inc., by Associates. (5) The best that we think could conceivably be constructed in petitioners' favor, on the record herein, is that the $104,000 purported loans by Associates should be considered as converted into shares of Little Theatre, Inc., on January 31, 1963 at the rate of $50 per share which would have entitled Associates to receive 2,080 shares. On this basis, even if we accept petitioners' contention that we should eliminate the 2,000 shares registered in Euster's name, Associates would have owned only 2,080 out of a total of 2,942 issued and outstanding, which would be less than 80 percent. On the basis of the record as a whole, we are unable to conclude that petitioners have carried their burden on this issue. Accordingly, we hold that Little Theatre, Inc., was not entitled to file *123 a consolidated return with the other corporations involved herein for the taxable year ended January 31, 1964. Issue 5. Addition to Tax Findings of Fact and Opinion Our examination of the entire record leads us to the conclusion that petitioners have carried their burden of proving that no part of the underpayment for the taxable year ended January 31, 1964 was due to negligence or intentional disregard of respondent's rules and regulations. We find accordingly and hold that petitioners are not liable for the addition to tax asserted by respondent under section 6653(a) for fiscal 1964. [12]
To reflect our determinations herein and the concessions made by the parties, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioners have conceded: (1) that Rand American Fund, Inc., was a personal holding company during the taxable year ended January 31, 1963 and subject to the personal holding company tax imposed by section 541; (2) that they failed to file a timely income tax return for the taxable year ended January 31, 1963 and are therefore liable for an addition to tax in accordance with the provisions of section 6651(a); and (3) that the statute of limitations is not a bar to the assessment and collection of the deficiencies asserted for the taxable years in question.↩
3. The parties are agreed that during all relevant periods of time the official conversion rate of pounds sterling to United States dollars was $2.80 for one pound. ↩
4. This amount ($340,661.15) covers the final drawing under the credit and was placed in escrow with Bankers Trust Company pending settlement of the subsequently described litigation.
5. This figure, when added to the $15,141.56 of legal expenses paid in fiscal 1964, corresponds exactly with respondent's figure for "cost basis of machinery" that appears in the statutory notice.
6. In the context of this case, we need not consider the extent to which an agreement to carry out a business venture in corporate form can be characterized as a joint venture. Compare Granik v. Perry, 418 F. 2d 832, 836 (C.A. 5, 1969); Colonial Refrigerated Transportation, Inc. v. Mitchell, 403 F. 2d 541, 546-547 (C.A. 5, 1968); Arditi v. Dubitzky, 354 F. 2d 483 (C.A. 2, 1965); Noto v. Cia Secula di Armamento, 310 F. Supp. 639, 646, n. 18 (S.D.N.Y. 1970); Jolin v. Oster, 44 Wis. 2d 623, 172 N.W. 2d 12 (1969); Kruger v. Gerth (dissent of Fuld, J.), 16 N. Y. 2d 802, 210 N.E. 2d 355 (1965)Lewis v. Gallemore, 173 Neb. 211, 113 N.W. 2d 54 (1962); Weisman v. Awnair Corporation of America, 3 N. Y. 2d 444, 144 N.E. 2d 415 (1957). We further note that, in any event, local law is not determinative as to whether a joint venture exists for Federal income tax purposes. See Hubert M. Luna, 42 T.C. 1067, 1077 (1964); Beck Chemical Equipment Corporation, 27 T.C. 840, 849↩ (1957). 7. The November 7, 1961 agreement and the complaint merely use the descriptive phrase "industrial venture."↩
8. Neither party has raised any issue as to the applicability of the so-called "tax benefit" rule. Section 111. Compare United States v. Skelly Oil Company, 394 U.S. 678↩ (1969).
9. Because respondent asserted an increased disallowance by way of his amended answer, he had the burden of proof as to the nondeductibility of $2,707.95 of this amount. ↩
10. Petitioners concede on brief that $8,105.89 is not deductible and agree that at least this amount should be considered part of the costs of the Gusau project.↩
*. The shares issued to Intervest and Associates, Inc., were represented by ten 100-sharecertificates.
11. SEC. 1504. DEFINITIONS. (a) Definition of "Affiliated Group." - Asused in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if - (1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and (2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations. As used in this subsection, the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.↩
12. As to the addition to tax under section 6651(a) for fiscal 1963, petitioners' concession (see footnote 2, supra) subjects them to liability therefor with respect to the increased deficiency asserted by respondent, which we have sustained.↩