JANE WAY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Way v. Commissioner
Docket Nos. 8253-89, 9297-89, 9338-89, 9443-89, 9643-89
United States Tax Court
T.C. Memo 1990-590; 1990 Tax Ct. Memo LEXIS 671; 60 T.C.M. (CCH) 1264; T.C.M. (RIA) 90590; November 19, 1990, Filed *671 Decisions will be entered under Rule 155. Susan N. Wasko, for the petitioners. Wendy S. Harris and David W. Sorensen, for the respondent. PATE, Special Trial Judge.
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION These consolidated cases were assigned and heard pursuant to section 7443A(b)(3) and Rule 180 et seq. [2]
Respondent determined the following deficiencies and additions to the following petitioners' income taxes: Additions to tax under
Sec. 6653
Sec.
Name
Year
Deficiency
(a)(1) (a)(2) [3]
6661
Jane Way
1985
$ 4,689.00
$ 234.45   *
none  1986
6,617.00
330.85   *
$ 1,654.25
Julianna Nandory
1985
2,523.00
126.15   *
none  1986
5,492.00
274.60   *
1,353.00
Ernesto and
1985
1,645.00
82.25   *
none  Mirna Gamboa
1986
3,075.00
103.75   *
none  Jean L. Gregory
1985
5,018.00
250.00   *
1,254.50
Arlene Lambert
1985
4,689.00
234.45   *
none  1986
6,503.00
325.15   *
1,625.75
*674 At calendar call, two days before trial, respondent moved to amend his answer to assert different grounds for his determination, which grounds resulted in deficiencies and additions to tax different from those set forth in the notices of deficiency. We took that motion under advisement. In the amended answer lodged with this Court, respondent claimed the following deficiencies and additions to tax: Additions to tax under
Sec. 6653
Sec.
Name
Year
Deficiency
(a)(1) (a)(2) [3]
6661
Jane Way
1985
$ 6,913.00
$ 346.00   *
$ 1,725.00
1986
6,009.00
300.00   *
1,502.00
Julianna Nandory
1985
2,936.00
147.00   *
none 1986
5,027.00
251.00   *
1,353.00
Ernesto and
1985
3,160.00
158.00   *
none Mirna Gamboa
1986
3,562.00
178.00   *
none Jean L. Gregory
1985
6,735.00
337.00   *
1,684.00
Arlene Lambert
1985
5,359.00
268.00   *
none 1986
6,106.00
305.00   *
1,527.00
*675 We must decide: (1) whether to grant respondent's motions to amend his answers in this consolidated case and, if so, whether the burden of proof with respect to the new deficiencies and additions to tax is on respondent in whole or in part; (2) whether petitioners underreported their tip income for 1985 and 1986; (3) whether petitioners are liable for the addition to tax for negligence, and (4) whether petitioners are liable for the addition to tax for substantial understatement of tax. FINDINGS OF FACT Petitioners in this case are Jane Way, Julianna Nandory, Ernesto and Mirna Gamboa, Jean L. Gregory, and Arlene Lambert. All petitioners resided in the State of Nevada at the time they filed their petitions. (Hereinafter, Mirna Gamboa is not included in our reference to "petitioners.") During the years at issue, *676 petitioners worked as waiters in Las Vegas, Nevada. Some of the facts have been stipulated and they are so found. The exhibits attached to the stipulation as well as those admitted at trial are incorporated by this reference. Terminology
In describing their activities, petitioners employed certain terminology customary in their trade. A short glossary follows: A "cover" is a customer of the Circus Maximus showroom at Caesar's Palace in Las Vegas, Nevada. A "station" is an area of the showroom with tables that can seat from 30 to 60 customers. A "walk out" is a customer who enters the showroom, orders his drinks and then leaves without paying. A "comp" is a customer who is allowed to view the show for free. A "stiff" is a customer who does not leave a tip. A "waiter" is a female or male "food server" at the Circus Maximus Showroom at Caesar's Palace in Las Vegas, Nevada. They are called "food servers," even though, except on special occasions, they serve only drinks. Hereinafter, we will refer to petitioners as "waiters." An "early out" is a waiter who, because of a slow evening, leaves early with the permission of management. A "bus boy" is a female *677 or male who assists the waiter in serving drinks. A "captain" is a female or male who seats customers and oversees the work of a number of waiters. "Guaranteed ticket sales" or "coupon sales" reflect tickets to the show which are sold by outside vendors to customers prior to the show. Included in the cost of a coupon is a 17-percent tip. Waiters collect the coupons in lieu of payment. The 17-percent tip included in the coupon is paid to the appropriate waiter through Caesar's Palace's payroll system as wages. Accordingly, coupon tips are included as "wages" on the waiter's Form W-2 at the end of the year, and the amount thereof is not in dispute. A "check" is a preprinted, prenumbered form supplied to waiters by personnel known as "checkers." The check has a check stub attached to it at the bottom. The check stub is numbered with the same number as the check. The waiters present checks to customers when asking for payment for the show, any extra drinks and related taxes. A "split tip" occurs when there is a large party sitting together and more than one waiter is assigned to work that party. A "tip out" is a tip that a waiter gives to the bartender, the bus boy who helped *678 him, and sometimes to checkers. The Circus Maximus showroom
During the years at issue, petitioners were waiters in the Circus Maximus showroom which is located in Caesar's Palace in Las Vegas, Nevada. Circus Maximus is a relatively prestigious showroom featuring famous entertainers. One or two shows are presented most nights. The cost of admission to the showroom includes two drinks; additional drinks are available for an extra charge. Ticket prices for Circus Maximus shows range from $ 20 to $ 40. In addition, customers must pay a 10-percent entertainment tax and a 6-percent sales tax. Therefore, exclusive of tip, a $ 20 ticket costs $ 23.20 ($ 46.40 for a couple), a $ 25 ticket costs $ 29 ($ 58.00 for a couple), a $ 30 ticket costs $ 34.80 ($ 69.60 for a couple), a $ 35 ticket costs $ 40.60 ($ 81.20 for a couple), and a $ 40 ticket costs $ 46.40 ($ 92.80 for a couple). Customers were not forewarned of the 16-percent tax and this additional cost perturbed many of them. Waiters were likely to earn greater tips when assigned to certain tables in the showroom. In an effort to distribute earnings more evenly, waiters were rotated among the various sections. Consequently, *679 all waiters had a relatively equal chance to make good tips. In addition, certain areas of the showroom were more difficult to serve. For example, waiters were required to remain 30 feet away from the stage during the main entertainer's performance. Therefore, waiters assigned to a station in the pit area (near the stage) attempted to serve all drinks and collect the checks before the show started. If they were unable to do so, completing their duties became more cumbersome and time consuming. Waiters' duties
On a typical shift, Circus Maximus divided the showroom into 24 to 28 stations, each manned by one waiter. Circus Maximus paid waiters for six hours of work, based upon an hourly rate of less than $ 5 per hour, whether they worked one show or two. Therefore, waiters had to rely on tips to make their jobs profitable. Circus Maximus assigned 5 or 6 waiters to arrive early and "set up" the showroom each evening. Any given waiter might be assigned to "set up" twice each week. Circus Maximus selected waiters for "set up" duty on a random basis which the waiters generally considered fair. Waiters who "set up" received pay for eight hours of work, instead of six. *680 After the captains seated customers at the waiters' stations, they gave each waiter a "starter" which showed the waiter's number, the table number, and the number of people in the party. After taking orders for drinks, waiters obtained a check for each party from a "checker." The checkers stapled the starter to the back of each check. Waiters then wrote the waiter's number, the table number, and the number of people in the party on each check. After they filled the drink orders, waiters took their trays past the checkers, who compared the number of drinks to those listed on the checks. While the waiters were serving the drinks, the checkers rang up the checks. To assist the waiters, Circus Maximus employed approximately eight bus boys. Each bus boy assisted from two to as many as six waiters. They worked hard because their income was greatly enhanced by tip outs from waiters. Each waiter was responsible for collecting the checks from his station. Customers paid by cash, credit card, coupons, room charges, or complimentary tickets. The method and mix of payment depended upon the time of year, whether there was a convention in town (because conventioneers generally used company *681 credit cards), and the ticket price (the higher the ticket price the more likely the customers used credit cards). After receiving payment, waiters paid the cashiers. Waiters retained the check stubs, however, to prove that the check had been paid, inasmuch as they were required to reimburse Circus Maximus for lost checks. Waiters were not allowed to ask for tips, but could indicate that the 16-percent surcharge on the check was for tax. The 16-percent tax had an adverse impact on customers' willingness to tip. Nevertheless, customers who did tip generally tipped a percentage of the cost of the showroom ticket, not merely a percentage of the value of the two drinks. Tippers who did not tip a percentage of the ticket price generally would round up their tip to the nearest dollar or five dollar denomination. For example, one waiter testified that sometimes couples left $ 85 for a $ 35 show. That amounted to a $ 3.80 tip ($ 85 - $ 81.20, or 5.43 percent of the ticket price). On average, charge customers left larger tips than cash customers. Some customers did not leave any tip. Although the average stiff rate varied between cash and credit customers, in 1985 and 1986, overall, *682 it averaged 15 percent. Because cash and credit customers were randomly seated in the showroom, each waiter experienced approximately the same stiff rate. Petitioners
Jane Way
At the time of trial, Jane Way (hereinafter Way) had been a waiter for 22 years. She was employed at Circus Maximus during 1985 and 1986. Way recorded her tips on her check stubs, including the amount, the date, the station she worked, and the number of covers she had. The stubs also reflected the amount of her coupon sales. She testified that, on average, she tipped out 10 to 15 percent to the bus boy, and $ 5 to the bar, per night, whether it was a one or two-show night. However, she did not record the dollar amount of her tip outs on her check stubs. Each month she summarized the information contained on the check stubs and then threw the check stubs away. At trial, she did not produce any records for 1985 or 1986. For 1985, Way reported $ 5,511.00 in "cash tips" (tips from both cash and credit card customers) and $ 3,668.95 in coupon tips, for a total of $ 9,179.95. She worked a total of 1,213 hours during 1985, and therefore, she reportedly averaged cash tips of $ 4.54 per hour *683 and total tips of $ 7.57 per hour. For 1986, Way reported $ 7,700.00 in cash tips, and $ 6,434.22 in coupon tips, for a total of $ 14,134.22. She worked a total of 1,320 hours in 1986, and therefore, reportedly averaged cash tips of $ 5.83 per hour and total tips of $ 10.71 per hour. Ernesto Gamboa
At the time of trial, Ernesto Gamboa had been employed at Circus Maximus as a waiter for 21 years. He contends that he reported all of his tips to his employer at the end of each month. He testified that he tipped out between $ 3 and $ 5 to the bar and $ 8 to $ 10 to the bus boy each night. He did not produce a diary or other records at trial. For 1985, Gamboa reported $ 5,198.00 in cash tips and $ 3,066.30 in coupon tips, for a total of $ 8,264.30. He worked 1,000 hours in 1985, reportedly averaging cash tips of $ 5.20 per hour and total tips of $ 8.26 per hour. For 1986, Gamboa reported $ 7,757.00 in cash tips and $ 5,753.01 in coupon tips, for a total of $ 13,510.01. He worked 1,208 hours in 1986, reportedly averaging cash tips of $ 6.42 per hour and total tips of $ 11.18 per hour. In 1985, Gamboa was married and had three children, ages two, eight and thirteen. *684 He was making payments on his home and two automobiles. He reported adjusted gross income of $ 14,230.00 and claimed itemized deductions of $ 9,549.00, supposedly leaving only $ 4,681.00 to support his family of five. Although he testified that he sold a piece of land and used the proceeds to support his family, neither his 1985 or 1986 income tax returns reflected such sale. Julianna Nandory
Julianna Nandory (hereinafter Nandory) began as a waiter at Circus Maximus in November of 1983 and had worked there for six years at the time of trial. She did not normally work weekends, which generally were the busiest days. She relied on bus boys extensively because she had undergone a hip transplant. She testified that she usually tipped out between $ 8 and $ 10 to the bus boy and between $ 3 and $ 5 to the bartender each night. She did not produce a diary or records for 1985 or 1986. For 1985, Nandory reported $ 423.00 in cash tips and $ 1,659.39 in coupon tips, for total tips of $ 2,082.39. She worked 628 hours in 1985, reportedly averaging cash tips of $ 0.67 per hour and total tips of $ 3.32 per hour. For 1986, Nandory reported $ 1,553.00 in cash tips and $ 5,218.92 *685 in coupon tips, for a total of $ 6,771.92. She worked 1,120 hours in 1986, reportedly averaging cash tips of $ 1.39 per hour and total tips of $ 6.05 per hour. Jean L. Gregory
Jean L. Gregory (hereinafter Gregory) worked as a waiter for Circus Maximus for approximately 20 years and was there in 1985. She retired in 1986, due to injuries sustained in an automobile accident. After work, Gregory wrote the amount of her tips on her check stubs together with the date, total tips, tip outs to the bus boy and the bartender, and her net. Generally, each day she would tip the bartender between $ 3 and $ 5 and the bus boy between 10 to 15 percent of her tips. She maintained a memo book or calendar at home, on which she generally recorded her net earnings. At the end of each month, she summarized her earnings and reported the result to her employer. She gave this same information to her tax return preparer at the end of the year. However, she did not produce any diary or records at trial. For 1985, Gregory reported $ 2,369.00 in cash tips and $ 3,013.18 in coupon tips, for a total of $ 5,382.18. She worked 986 hours in 1985, reportedly averaging cash tips of $ 2.40 per *686 hour and total tips of $ 5.46 per hour. Arlene B. Lambert
Arlene B. Lambert (hereinafter Lambert) worked as a waiter for Circus Maximus from 1979 to 1987. She was unemployed at the time of trial. After work, Lambert counted her tips and wrote the total thereof in a diary or on a piece of paper. She testified that each night, she tipped out between $ 5 and $ 10 to the bus boy and $ 3 to the bartender. At the end of each month, she summarized the daily information. She did not report this information to her employer, but did report it to her accountant at the end of the year. At trial, she did not produce a diary or records for 1985 or 1986. For 1985, Lambert reported $ 432.00 in cash tips, and $ 2,690.14 in coupon tips, for a total of $ 3,122.14. She worked 904 hours in 1985, reportedly averaging cash tips of $ 0.48 per hour and total tips of $ 3.45 per hour. At trial, she acknowledged that she earned more than $ 432.00 in cash tips during 1985. For 1986, Lambert reported $ 3,401.00 in cash tips and $ 6,302.23 in coupon tips, for a total of $ 9,703.23. She worked 1,216 hours in 1986, reportedly averaging cash tips of $ 2.80 per hour and total tips of $ 7.98 *687 per hour. Internal Revenue Service Determinations
Respondent issued notices of deficiency to petitioners based on information supplied by Circus Maximus and upon the application of the "8-percent allocation method." Respondent since has conceded that the notices of deficiency are in error. He has abandoned the 8-percent allocation method, as well as the amounts resulting from its application. Consequently, we will consider them no further. In his amended answer, respondent asserted new deficiencies for each petitioner under the "McQuatter's formula," named after our decision in McQuatters v. Commissioner, T.C. Memo. 1973-240. To compute the new deficiencies, respondent used the following additional information received from Caesar's Palace. 1985
1986
Gross sales
$ 13,933,539
$ 16,169,514
Coupon sales
unavailable
1,502,305
Charge sales
3,316,548
4,031,029
including tips
Charge tips
$     362,363
$     394,708
Total hours worked
40,089
45,052
Respondent then used a two-step method to compute an hourly rate for tips. First, he determined a tip rate by adopting the two percent cash differential *688 used in McQuatters v. Commissioner, supra, to differentiate between tips left by customers who paid cash and those who used credit cards. His computation follows. 1985
1986
Charge sales including tips
$ 3,316,548
$ 4,031,029
Charge tips
362,363
394,708
Charge tip rate
10.92%
9.79%
Cash tip differential
2.00%
2.00%
Cash tip rate
8.92%
7.79% Then respondent computed an hourly rate of net cash tips for each year, as follows: 1985
1986
Gross sales
$ 13,933,539 $ 16,169,514 Less: coupon sales
unavailable (1,502,305)
Gross receipts
$ 13,933,539 $ 14,667,209 Less: charge sales
including tips
(3,316,548)
(4,031,029)
Less: 15% stiff factor
(1,592,548)
(1,595,427)
Sales subject to cash tips
$  9,024,443 $  9,040,753 Cash tip rate
8.92%
7.79%
Cash tips received
$     804,980 $     704,274 Add charge tips
362,363 394,708 Total tips received
$    1,167,343 $    1,098,982 Less: tip outs
(175,101)
(164,847)
Adjusted tips
$    992,242 $ 934,135 Total hours worked
40,089 45,052 Net cash tips per hour worked
(after tip outs)
$ 24.75 $     20.73
*689 Second, respondent applied the above tip rates to the number of hours each petitioner worked in 1985 and 1986 to arrive at tip income, exclusive of coupon tips, for each year. He then subtracted the amount of tip income that each petitioner reported, to arrive at unreported tip income for 1985 and 1986. Tip Income
1985
1986
Petitioner
reported
unreported
reported
unreported
Way
$ 5,551
$ 25,724
$ 7,700
$ 20,984
Gamboa
5,198
20,552
7,757
18,492
Nandory
423
15,698
1,553
22,605
Gregory
2,369
22,035
N/A
N/A
Lambert
432
23,170
3,401
21,827
OPINION AMENDED ANSWERS AND BURDEN OF PROOF As a preliminary matter, we must first address respondent's motion to amend his answer. His amended answer reflects his recomputation of petitioners' tip income using a new method of computation. Petitioners contend that it would be unfair to allow respondent to change his position at such a late date. In general, we allow respondent to file amendments to answers "freely when justice so requires." Rule 41. In determining whether justice *690 so requires, we focus on whether petitioner would be prejudiced thereby. Waterman v. Commissioner, 91 T.C. 344, 349 (1988). Although we do not imply any approval for respondent's delay in filing amended answers in these cases, we cannot find the requisite prejudice necessary to preclude the filing of the amended answer. Betz v. Commissioner, 90 T.C. 816 (1988). Petitioners were apprised in the notice of deficiency that their tip income was at issue. At the time they filed their petitions, petitioners were on notice that they would be called upon to prove affirmatively the amount each of them actually received in tips. Therefore, they could have proceeded to prepare their cases accordingly. Petitioners were not prejudiced by the timing of respondent's switch from the "8-percent allocation method" to the "McQuatter's formula" for computing tip income. They were notified of respondent's intent to switch more than a month before trial. This notification gave them ample opportunity to contact Caesar's Palace to determine what additional information Caesar's Palace had with regard to this method of computation and/or supplied to respondent. In *691 this regard, we note that petitioners made no attempt to contact Caesar's Palace during the time which elapsed between filing their petition and trial with respect to respondent's original determination, although it too was based on figures reported by Caesar's Palace. Moreover, respondent produced a witness to explain the additional information and this witness was subjected to petitioners' cross-examination. In addition, we find that petitioners had sufficient time in which to challenge the propriety of the use of the "McQuatter's formula." They had ample notice before trial. Moreover, they could argue that question in the briefs which were not due until 90 days after trial. For these reasons, we grant respondent's motion to amend his answer. Before we proceed to address the substance of respondent's assertions, however, we must first determine which party carries the burden of proving the amount of petitioners' tip income. In this Court, taxpayers generally have the burden of proving that respondent's determination is erroneous. Welch v. Helvering, 290 U.S. 111 (1933). *692 Nonetheless, in situations where respondent increases a deficiency in his answer, the burden of proof is on respondent as to the increased amount of the deficiency. Beck Chemical Equipment Corp. v. Commissioner, 27 T.C. 840 (1957); Rule 142. Moreover, where respondent departs from the grounds upon which he based his original determination and relies upon other grounds in an amended answer, he assumes the burden of proof with respect to the new grounds. Rule 142; see Papineau v. Commissioner, 28 T.C. 54 (1957). Here, respondent departed from the grounds upon which he based his original determination when he changed his method of reconstructing petitioners' income from the "8-percent allocation" method to the "McQuatter's formula." In so doing, he asserted different amounts of unreported income, some of which are larger than and some of which are smaller than those contained in his original determinations. We were faced with making a similar decision in Schwartz v. Commissioner, T.C. Memo. 1981-94. In that case, respondent determined that the taxpayer underreported his income and determined a deficiency based on the "bank deposits" *693 method of reconstructing income. In a motion to amend his answer, respondent asked that he be allowed to convert the case into a "specific items" method, allegedly resulting in an increased deficiency. He later abandoned the increased deficiency and requested findings of fact based on both the bank deposits and specific items methods. Use of both methods resulted in a decreased deficiency. Under these circumstances, we placed the burden of proof on respondent, reasoning that: Where respondent increases a deficiency in his answer, the burden of proof is on respondent only as to the increased amount of the deficiency. Beck Chemical Equipment Corporation v. Commissioner, 27 T.C. 840 (1957);Rule 142, Tax Court Rules of Practice and Procedure. * * * But where, as here, respondent departs from the grounds upon which he based his original determination of deficiency, and in an amended answer relies upon other grounds to support the deficiency, he assumes the burden of proof with respect to the new grounds for his claim. Rule 142, Tax Court Rules of Practice and Procedure; see Papineau v. Commissioner, 28 T.C. 54 (1957).Here respondent changed *694 his method * * * of reconstructing [the taxpayer's] income from the bank deposits method and so he has the burden of proving their unreported income based on specific items.
Later, in Achiro v. Commissioner, 77 T.C. 881, 890 (1981), we further defined the line of demarcation when we stated: The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968); Estate of Sharf v. Commissioner, 38 T.C. 15, 27-28 (1962).However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972); McSpadden v. Commissioner, supra; *695 Papineau v. Commissioner, 28 T.C. 54, 57 (1957); Tauber v. Commissioner, 24 T.C. 179, 185 (1955).* * * Applying these principles to the instant case, we find that respondent admitted that he made errors in computing petitioners' deficiencies under the 8-percent allocation method he used in the notices of deficiency. Consequently, he decided to abandon that method and, in lieu thereof, substituted a new method which required additional information. Proving this new method to be correct requires presentation of different evidence. Therefore, it constitutes a new matter. Accordingly, we find that respondent assumes the burden of proof with respect to the new grounds for his claim, i.e., his determinations based upon the "McQuatter's formula." TIP INCOME It is well established that tips constitute compensation for services rendered and are includable in gross income under section 61(a). Catalano v. Commissioner, 81 T.C. 8, 13 (1983), affd. without published opinion 735 F.2d 1370 (5th Cir. 1984).Every employee *696 who receives tips must report those tips to his employer on at least a monthly basis. Sec. 6053(a). In turn, certain employers must report those tips and allocated tips to respondent. Sec. 6053(c)(1)(D) and (E). The amount of allocated tips is computed under section 6053(c)(3)(A), according to one of the methods comprehensively prescribed in the regulations. See sec. 31.6053-3(d) (1), (e), and (f), Employment Tax Regs. Generally, the amount of allocated tips equals 8 percent of gross receipts, less actual tips reported by the employee. Sec. 6053(c)(3)(A). Further, all taxpayers are required to maintain records sufficient to determine their correct tax liability. Sec. 6001; Menequzzo v. Commissioner, 43 T.C. 824, 831-832 (1965).When a taxpayer receives tips on a daily basis, he is required to keep an accurate and contemporaneous record of such income. Sec. 1.6001-1(a), Income Tax Regs. Taxpayers must keep these records "so long as the contents thereof may become material in the administration of any internal revenue law". Sec. 1.6001-1(e), Income Tax Regs.
If taxpayers do not maintain records of *697 tip income, or if their records do not clearly reflect income, respondent may compute income in a manner that does clearly reflect income. Sec. 446(b); Menequzzo v. Commissioner, supra at 831.Respondent has great latitude in adopting a suitable method for reconstructing the taxpayer's income. Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).It is sufficient if respondent's reconstruction is reasonable in light of the surrounding facts and circumstances. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963). After due consideration of the evidence in this case, we find that respondent has borne his burden of proof at least as to some of the factors used in his computation. We have modified the other factors to conform to the proof. First, it is clear that respondent proved that each petitioner underreported tip income for each of the years at issue. Although, as waiters, all petitioners had to do was serve but two drinks, petitioners were working at a prestigious showroom in Las Vegas, Nevada, which charged a high price for showroom tickets. Therefore, on average, we believe that waiters at Circus Maximus could expect a *698 much greater tip for such work than they could have from serving only two drinks at the average pub. Nevertheless, they all reported relatively low amounts of tip income. When we focus upon the number of hours each petitioner worked, for example, their reported cash tips averaged between $ 0.48 and $ 6.42 per hour. These amounts are ridiculously low. Moreover, there was no consistent pattern in their reporting, i.e., the ratios of cash tips reported to credit card tips earned varied widely. Yet, because credit card customers were evenly distributed around the showroom and waiters were rotated evenly throughout, each waiter had a relatively equal chance to receive both cash and credit card tips. Taking Caesar's Palace's own figures for total charge tips for 1985 ($ 362,363.00) and dividing that amount by the total hours worked in 1985 (40,089) we calculate that each waiter earned an average of $ 9.04 per hour in charged tips, alone, during 1985. This hourly rate does not include tips that were paid in cash. The hourly charge tip rate for 1986 comes out to $ 8.76 ($ 394,708.00 divided by 45,052). Had each petitioner reported only his or her share of charge tips, we find *699 that each petitioner would have reported approximately twice, or even three times, what she or he did report. For example, Way worked 1,213 hours in 1985. Therefore, her credit card tips, alone, approximated $ 10,966.00 ($ 9.04 times 1,213). However, she reported total tips of only $ 5,511.00 for 1985. Although her reported tips were net of tip outs, such tip outs, as explained below, did not account for this magnitude of underreporting. In addition, none of the petitioners produced any records at trial even though they testified that they kept records. Significantly, petitioners are experienced waiters; they have all been in the business a long time. It is incomprehensible that they would not have known the importance of retaining the records they purportedly kept. Having proved that petitioners underreported their income, however, brings respondent only half-way home. He must also support the "McQuatter's formula" he used as well as the amounts which the formula produced. We have painstakingly examined each aspect of respondent's calculations in this regard, and find that he has fully supported certain factors therein, but has failed to fully support other factors. Our *700 analysis of these factors follows. Gross receipts
As we noted above, coupons sold to customers already included a 17-percent tip payable to the waiter. These tips were added to petitioners' wages and reported on their Forms W-2. Therefore, coupon sales may not be taken into account in computing receipts subject to cash tips. Respondent properly deducted coupon sales from gross receipts for 1986, but failed to subtract them for 1985, because Caesar's Palace could not provide the amount thereof. However, ignoring such sales is not justifiable. Coupon sales could have, at least, been estimated. Because the record does not contain any indication that the rate of 1985 coupon sales was substantially different from 1986 coupon sales, we will assume that coupon sales comprised the same percentage of gross receipts for both years. Accordingly, we find coupon sales constituted 9.29 percent of gross receipts, or $ 1,294,426.00 in 1985. Stiff factor
The parties do not dispute that a significant percentage of customers who patronized Circus Maximus did not tip. Testimony of stiff rates ranged from 10 to 30 percent, depending, among other factors, upon whether the *701 customer was paying with cash or by credit and whether the customer was American or visiting from another country. Respondent determined that the average stiff rate was 15 percent, but applied that percentage only to cash sales. We find that overall percentage to be reasonable. However, we believe the percentage is more properly applied to gross sales before deduction of credit card sales inasmuch as much of the testimony makes no distinction between customers using credit cards or paying cash. Coupon sales must be excluded, however, as they always included a tip. Tip rate
Respondent attempted to distinguish between tips on credit sales and cash sales for each year, but failed to develop the record, or his method, sufficiently. Although it is not disputed that credit card customers gave larger tips than cash customers, there is insufficient evidence to support the 2-percent differential respondent selected. Respondent did show that the charge tip rate (the rate of tips paid by customers who charged their tips) was 10.92 percent in 1985 and 9.79 percent in 1986. However, these tip rates are, by far, the upper boundaries of rates paid in the years at issue. Although *702 a tip rate necessarily is an estimate, we are convinced by the record that reducing the charge tip rate by only 2 percent is insufficient. As we emphasized above, the waiters at Circus Maximus did not serve any food; all they had to serve was two drinks. Therefore, although the customers tipped on a percentage of the showroom price, we do not think that they would have tipped the "customary" 15-percent of the total ticket price. For example, a couple who attended a $ 40 show, paid $ 92.80 for that show, including taxes. While they may have left $ 100 (a $ 7.20 tip or 9 percent of the ticket price), we are unconvinced from the record that many cash customers would have left more than that. We find it more plausible that an overall tip rate of 8 percent more accurately reflects the average rate of tips left by customers, regardless of their method of payment. Respondent has failed to establish a higher overall tip rate. Total hours
While petitioners do not agree that 40,089 hours were worked by waiters in 1985, and that 45,052 hours were worked by waiters in 1986, these numbers were supplied by Caesar's Palace and petitioners did not submit any evidence to make us doubt *703 the accuracy of those numbers. Accordingly, we have used them in our computation. Tip outs
To arrive at an accurate estimate of petitioners' unreported tip income, we must take into account petitioners' practice in tipping out to bus boys and bartenders. Each of the petitioners testified that he or she usually tipped out at a specific rate, but none of them provided any records of the specific amounts they actually tipped out during the years in issue. Most of the petitioners testified that they tipped out between $ 3 and $ 5 per night to the bartenders, and between $ 5 and $ 10 per night to bus boys. To a certain extent, respondent's witness corroborated this testimony. Therefore, in our computations below, we have allowed petitioners a deduction for tip outs at the rate of $ 4 per night for the bartender and $ 9 per night for the bus boy, or a total of $ 13 per night. To apply the tip out rate, we must ascertain how many nights each petitioner worked. Although, the record does not contain this information, we can estimate the number of nights with reasonable accuracy. We know the total number of hours each petitioner worked each year. We also know that waiters *704 worked approximately five nights each week and were chosen to "set up" on two of those nights, for which they received eight hours' pay instead of six. Therefore, they averaged 6.8 hours per night. Dividing this average into total hours worked produces the approximate number of nights each petitioner worked for each year. Conclusion
Based on these criteria, we have prepared the following computation which shows that each waiter, including petitioners, who worked at Circus Maximus averaged cash tips of $ 21.44 per hour in 1985 and $ 22.14 per hour in 1986. 1985
1986
Gross sales
$ 13,933,539 $ 16,169,514 Coupon sales
(1,294,426)
(1,502,305)
Sales subject to tips
12,639,113 14,667,209 Stiffs (15 percent)
(1,895,867)
(2,200,081)
Receipts subject to tips
$ 10,743,246 $ 12,467,128 Tips at 8 percent
$    859,460 $    997,370 Total hours worked
40,089 45,052 Tips per hour worked
(before tip outs)
$      21.44 $      22.14 Having arrived at an average hourly rate for tips and an average nightly rate for tip outs, we can now compute the amount *705 of net tips (other than those from coupon sales already included in petitioner's Form W-2) that each petitioner received for each of the years at issue. 1985 Way
Gamboa
Nandory
Gregory
Lambert
Hours worked
1,213 1,000 628 986 904 Nights worked
178 147 92 145 133 Tips received
$ 26,007 $ 21,440 $ 13,464 $ 21,140 $ 19,382 Less: tip outs
(2,314)
(1,911)
(1,196)
(1,885)
(1,729)
Net tips recvd.
23,693 19,529 12,268 19,255 17,653 Reported tips
(5,511)
(5,198)
(423)
(2,369)
(432)
Unreported tips
$ 18,182 $ 14,331 $ 11,845 $ 16,886 $ 17,221 1986
Hours worked
1,320 1,208 1,120 -0-
1,216 Nights worked
194 178 165 179 Tips received
$ 29,225 $ 26,745 $ 24,797 $ 26,922 Less: tip outs
(2,522)
(2,136)
(1,980)
(2,148)
Net tips recvd.
26,703 24,609 22,817 24,774 Reported tips
(7,700)
(7,757)
(1,553)
(3,401)
Unreported tips
$ 19,003 $ 16,852 $ 21,264 N/A
$ 21,373 To the extent that our table may not be entirely accurate, we observe that these cases arose out of *706 petitioners' failure to produce adequate books and records,as required by law. We have little sympathy for petitioners for they are the architects of their own predicament. ADDITION TO TAX - SECTION 6653(a)
As he did in his notices of deficiency, respondent continues to assert in his amended answers that each petitioner is liable for the addition to tax for negligence for each of the years at issue. Section 6653(a)(1) imposes a 5-percent addition to tax on the entire amount of an underpayment of tax if any amount thereof is due to negligence or intentional disregard of rules and regulations. In addition, section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on that portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Section 6653(1)(A) and (B) for 1986 contains essentially the same provisions. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Ryback v. Commissioner, 91 T.C. 524, 565 (1988); *707 Neely v. Commissioner, 85 T.C. 934, 947 (1985). To the extent that the amounts of these additions have increased based upon this opinion, respondent bears the burden of proving that petitioners are liable for the additions to tax as set forth in his amended answers. Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981);Rule 142(a). Nevertheless, regardless of which party bears the burden to prove negligence in this case, the record is abundantly clear that each petitioner is liable for the addition to tax for negligence. Each petitioner in this case has failed to refute respondent's convincing showing that he or she was negligent in failing to maintain and retain adequate records and in failing to report fully his or her tip income. Petitioners' failure to retain records sufficient to determine the propriety of the income they reported from tips is clearly negligent. Menequzzo v. Commissioner, 43 T.C. 824, 836 (1965); Schroeder v. Commissioner, 40 T.C. 30, 34 (1964).Moreover, from the record it is equally clear that petitioners understated their tip income for each year at issue which warrants our finding that *708 each petitioner negligently or intentionally disregarded the rules and regulations. See, e.g., Emmons v. Commissioner, 92 T.C. 342 (1989), affd. 898 F.2d 50 (5th Cir. 1990).Accordingly, all petitioners are liable for the additions to tax for negligence. ADDITION TO TAX - SECTION 6661
In the notices of deficiency, respondent determined that certain petitioners were liable for the section 6661 addition to tax. However, the numbers, the years and, in some cases, the particular petitioners, against whom respondent has determined this addition to tax, changed in the amended answers. In his amended answer, respondent asserted that Way and Lambert are liable for the section 6661 addition to tax for 1985 and 1986, and that Gregory is liable for the section 6661 addition to tax for 1985. Section 6661 imposes on any taxpayer who substantially understates his income tax liability, an addition to tax equal to 25 percent of the amount of any underpayment attributable to such understatement. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). *709 Section 6661(b)(1)(A) defines a substantial understatement of income tax as an amount which exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $ 5,000. Petitioners offered no evidence to refute respondent's contentions. Therefore, after recomputation in accordance with this opinion, if there exits a substantial understatement of income tax liability as to any of the petitioners named in the amended answer, then such petitioner is liable for the section 6661 addition to tax. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners were consolidated herewith: Ernesto Gamboa and Mirna Gamboa, docket No. 9297-89; Julianna Nandory, docket No. 9338-89; Jean L. Gregory, docket No. 9443-89; and Arlene B. Lambert, docket No. 9643-89.↩
2. All section references are to the Internal Revenue Code as amended and in effect for the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Section 6653(a)(1) and (a)(2) has been redesignated for taxable year 1986 as section 6653(a)(1)(A) and (B)↩, respectively. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(a), 100 Stat. 2742.
3. Section 6653(a)(1) and (a)(2) has been redesignated for taxable year 1986 as section 6653(a)(1)(A) and (B)↩, respectively. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(a), 100 Stat. 2742.